No. 42,631

THE STATE OF KANSAS, ex rel. WILLIAM M. FERGUSON, Attorney General, *Appellant,* v. THE CITY OF PITTSBURG, a Municipal Corporation, and Its Governing Body, to-wit: HOMER W. RILEY, Commissioner and Mayor, and CLAUDE JACKSON, DICK R. BUTLER, HAROLD W. COMPTON and CHARLES CAMPBELL, Commissioners of said City, *Appellees.*

(364 P. 2d 71)

Opinion filed August 1, 1961.

*Fred W. Rausch, Jr.,* Assistant Attorney General, argued the cause, and *William M. Ferguson,* Attorney General, was with him on the brief for the appellant.

*Charles Menghini* and *H. Gordon Angwin,* both of Pittsburg, argued the cause, and *Paul Armstrong,* of Columbus, was with them on the brief for the appellees.

The opinion of the court was delivered by

PRICE, J.: The question in this case concerns the constitutionality of Senate Bill No. 298, which was passed by the 1961 legislature and became effective on March 29, 1961, upon publication in the official state paper. The act appears as Chapter 81, Session Laws of 1961.

The detailed provisions of the act, and the contentions with respect thereto, are such that no attempt will be made to summarize them. We therefore quote the act in full:

"AN ACT relating to cities; authorizing cities to purchase, construct, reconstruct, equip, maintain, repair, lease and sell under lease-purchase agreements, and acquire sites for agricultural, commercial, industrial and manufacturing facilities, authorizing cities to finance said facilities solely from the proceeds derived from the sale of revenue bonds.

"*Be it enacted by the Legislature of the State of Kansas:* ·

"SECTION 1. *Purpose of act.* It is hereby declared that the purpose of this act shall be to promote, stimulate and develop the general economic welfare and prosperity of the state of Kansas through the promotion and advancement of industrial, commercial, agricultural, natural resources and recreational development in the state; to encourage and assist in the location of new business and industry in this state and the expansion of existing business development; and to promote the economic stability of the state by providing greater employment opportunities and diversification of industry thus promoting the general welfare of the citizens of this state by authorizing all cities of the state to issue revenue bonds, the proceeds of which shall be used only to purchase or construct, maintain and equip buildings and acquire sites therefor and to enlarge or remodel buildings and equip the same for agricultural, commercial, industrial and manufacturing facilities and to enter into leases or lease-purchase agreements with any person, firm or corporation for said facilities.

"SEC. 2. *Construction of facilities and lease or lease-purchase agreements for facilities constructed for agricultural, commercial, industrial, natural resources, recreational development and manufacturing enterprises.* Any city shall have power to issue revenue bonds, the proceeds of which shall be used only to purchase, construct, reconstruct, equip, maintain or repair buildings and to acquire sites therefor, and to enlarge or remodel said buildings and equip the same for agricultural, commercial, industrial, natural resources, recreational development and manufacturing facilities with power to enter into leases or lease-purchase agreements by ordinance with any person, firm or corporation for said facilities, said facilities to be constructed in any city or its environs without limitation as to distance, providing the governing body of said city declares that said facility, if in being, would promote the welfare of the city.

"SEC. 3. *Conditions of agreement.* Such agreements shall provide for a rental sufficient to amortize the cost of facilities to be constructed and equip-

ment, plus the fair market value, on the date of the agreement, of the site, if it is necessary to purchase a site. Such agreements shall also provide for a reasonable rate of interest on the outstanding principal and reimburse the city for the cost of any other obligation assumed by it under the contract.

"SEC. 4. *Obligations payable solely from rentals; bonds, requirements.* Nothing in this act shall be so construed as to authorize or permit any city to make any contract or to incur any obligation of any kind or nature except such as shall be payable solely out of the rentals from such facilities. Such cities may issue bonds payable solely and only from the revenues derived from such facilities. Such bonds may be issued in such amounts as may be necessary to provide sufficient funds to pay all the costs of purchase or construction of such facility, including site, engineering and other expenses, together with interest. Bonds issued under the provisions of this act are declared to be negotiable instruments, shall be executed by the mayor and clerk of the city, and shall be sealed with the corporate seal of the city. The principal and interest of said bonds shall be payable solely and only from the special fund herein provided for such payments, and said bonds shall not in any respect be a general obligation of such city, nor shall they be payable in any manner by taxation. All details pertaining to the issuance of such bonds and the terms and conditions thereof shall be determined by ordinance of the city.

"SEC. 5. *Pledge of facility and earnings.* The governing body of the city by ordinance may pledge the facility purchased or constructed and the net earnings therefrom to the payment of said bonds and the interest thereon, and provide that the net earnings thereof shall be set apart as a sinking fund for that purpose.

"SEC. 6. *Amount of revenue bonds.* In no case in which revenue bonds are issued under and by virtue of this act shall any revenue bonds be issued for the cost of the facility, including the site therefor, in excess of the actual cost of the same.

"SEC. 7. *Bonds and income therefrom exempt from taxation.* All bonds issued pursuant to this act and all income or interest therefrom shall be exempt from all state taxes except inheritance taxes.

"SEC. 8. *Revenue bonds, defined, recitals.* Revenue bonds, as the term is used in this act, are defined to be bonds issued by any such city to be paid exclusively from the revenue produced by the property and facilities improved, constructed, reconstructed, repaired or otherwise improved by the use of the proceeds of said bonds. Such revenue bonds shall not be general obligations of the city, and shall not contain the recitals set forth in section 10-112 of the General Statutes of 1949, or any amendments thereto. Such revenue bonds shall, however, contain the following recitals, viz.: Such bonds shall recite the authority under which such revenue bonds are issued, and that they are issued in conformity with the provisions, restrictions and limitations thereof, and that such bonds and the interest thereon are to be paid from the money and revenue received from the fees charged and rental received for the use of the property and facilities improved, constructed, reconstructed, repaired or otherwise improved by the proceeds, in whole or in part, of such revenue bonds when issued and sold.

"Sᴇᴄ. 9. *Construction of act.* The enumeration of any object, purpose, power, manner, method or thing in this act shall not be deemed to exclude like or similar objects, purposes, powers, manners, methods or things.

"Sᴇᴄ. 10. *Act supplemental.* This act shall be cumulative of any other law or laws relating to the subject of this act and shall be supplemental thereto.

"Sᴇᴄ. 11. *Effective date.* This act shall take effect and be in force from and after its publication in the official state paper."

Shortly after the effective date of the act, and pursuant to the authority granted thereunder, the governing body of the city of Pittsburg passed two ordinances (Nos. S-10 and S-11) whereby the city was authorized to issue revenue bonds in an amount not to exceed $130,000 for the purpose of purchasing a site and constructing and equipping a building or other facilities thereon—the same in turn to be leased to the Trialloy Company, Inc., for the operation of a textile business.

The state, upon the relation of the attorney general, filed this action in quo warranto to test the authority of the city to proceed under the two mentioned ordinances—the basis of the action being that the act is unconstitutional and void in several particulars, and therefore the ordinances and all proceedings thereunder are likewise void. The prayer of the petition was that the city and its governing body be ousted and permanently enjoined from proceeding further in the matter.

At the conclusion of the trial the court found that the purposes for which revenue bonds may be issued under the act are for the public benefit and for a public purpose. As conclusions of law, the court held the act not to be unconstitutional on any of the grounds asserted and rendered judgment in favor of defendant city and its governing body.

The state has appealed, and by appropriate specifications of error raises the questions hereafter discussed.

No attack is made on the ordinances—*as such.* The contention is that the act itself is unconstitutional and therefore the ordinances and all proceedings thereunder are likewise void.

## I and V.

The first and fifth contentions will be considered together. They are (I) that the act is contrary to the public policy of the state because the purposes for which revenue bonds may be issued thereunder are not public in nature and are not for public purposes, and (V) that the act violates section 5 of article 12 of our constitution, which reads:

"Provision shall be made by general law for the organization of cities, towns and villages; and their power of taxation, assessment, borrowing money, contracting debts and loaning their credit, shall be so restricted as to prevent the abuse of such power."

In this connection it is argued that the act in effect authorizes a city to loan its credit for the furtherance and promotion of a business or industry strictly private in nature; and that any economic benefit resulting to the city and its inhabitants through increased employment, and the like, is purely secondary to the benefits and advantages accruing to the private industry so "subsidized"—all of which, it is contended, is contrary to the public policy of the state and violates that portion of the quoted constitutional provision which provides that the powers conferred on cities by law "shall be so restricted as to prevent the abuse of such power."

In an early case dealing with the constitutional provision in question (*Hines et al. v. City of Leavenworth et al.,* 3 Kan. 186) it was said:

"It is not a subject proper for judicial cognizance but belongs to another tribunal. It would involve the exercise of a discretion that the framers of the constitution never intended should be deposited in any court. It would in effect constitute the court a law-maker rather than a law expounder. When a law is passed embracing any of the subjects mentioned in the fifth section, it is the duty of the court, when called upon, to determine whether it contains restrictions, and if it does contain them the law must be held to be valid, notwithstanding the members of the court might doubt their sufficiency to prevent abuses. It is a subject wholly under the control of the political department of the government. Whatever the legislature determines to be a sufficient restriction, if it be a restriction at all, must be final." (pp. 203, 204.)

A portion of the foregoing statement was quoted with approval in *Wulf v. Kansas City,* 77 Kan. 358, 362, 363, 94 Pac. 207, where, at page 367, in discussing the determination of the validity of legislative acts, it was said:

"(1) Our constitution limits, rather than confers, power, and hence we look to it to see what it prohibits instead of what it authorizes. (Citing.) (2) To declare an act of the legislature unconstitutional some provision must be pointed out which, either in terms or by necessary implication, makes it so. (Citing.) (3) The judicial department should not interfere with the legislative conscience, unless there be a clear violation of some provision of the constitution. (Citing.) (4) No statute should be declared unconstitutional unless the infringement of the superior law is clear beyond substantial doubt. (Citing.)"

The Hines and Wulf cases were cited with approval in *State, ex rel., v. Kansas City,* 140 Kan. 471, 476, 37 P. 2d 18, and *State, ex rel., v. Kansas City,* 149 Kan. 252, 255, 86 P. 2d 476, which dealt

with the right of the city of Kansas City to issue revenue bonds in connection with the construction and improvement of public levees and wharves. With respect to section 5 of article 12, above, it was said in the last-mentioned case, at page 255:

"This provision has been the subject of judicial exposition ever since the foundation of the state. It scarcely states a rule of constitutional law that a court can lay hold of. It is largely admonitory and was intended by the framers of our constitution to be addressed to the wisdom and conscience of the legislative branch of our state government."

In *State, ex rel., v. Kansas City,* 151 Kan. 2, 98 P. 2d 101, an aftermath of the two Kansas City cases above, it was held that where an act authorized the city to issue revenue bonds for the construction and improvement of its public levees and to establish thereon a wholesale fruit and vegetable market, a resolution of the city to expend a portion of the terminal market's rental income and to offer abatements of rents to procure desirable prospective tenants, did not transcend the express or implied limits of authority conferred on the city government so as to warrant judicial interference therewith. In the course of the opinion it was said:

"Note that the statute says the governing body of the city may lease the market facilities upon such terms and conditions 'as in the judgment of said governing body will be to the best interests of the city.' Under such a broad grant of statutory power, it would appear that what the city and its governing officials undertake to do would have to transcend all reasonable bounds of official discretion before a court would be justified in interfering. . . . It may be suggested that if defendants have such broad discretionary authority they or their successors in office may allow unfair discrimination or abatements of rent between tenants, or exercise favoritism in other respects. That, of course, is a possibility, but if the hands of public officials are to be *judicially* tied on that account, where the legislature itself has not seen fit to tie them, any official board or officer could be stopped by judicial interference. However, Kansas government is founded on the assumption that public officers and boards, great and small, will exercise their express and implied powers fairly and honestly." (pp. 8, 9 and 10.)

And see the early case of *Leavenworth Co. v. Miller,* 7 Kan. 479, 12 A. R. 425, in which a statute authorizing counties to subscribe to the capital stock of railroad companies and to issue bonds in payment therefor was under attack, where it was held:

"The government may accomplish a public purpose through the means of a private agency, a private individual or individuals, or a private corporation. It is the ultimate object to be obtained which must determine whether a thing is a public or a private purpose. The ultimate object of the government in granting municipal aid to railroads is to increase the facilities for travel and

transportation from one part of the country to the other, which object is, in its nature, a public purpose." (syl. 13.)

Legislation similar to the act here under consideration has been stricken down in several states—and upheld in others.

In *Village of Moyie Springs, Idaho v. Aurora Mfg. Co.*, 82 Idaho 337, 353 P. 2d 767, it was held that a similar act violated a specific provision of the constitution prohibiting a county, city, town, township, board of education, school district or other subdivision from lending or pledging the credit or faith thereof, directly or indirectly, in any manner, to, or in aid of, any individual, association or corporation, for any amount or for any purpose whatever.

The Supreme Court of Florida struck down a similar act as being violative of a specific provision of the constitution of that state which prohibits the legislature from authorizing any city to lend its credit to any corporation. (*State v. Town of North Miami, Fla.*, 59 So. 2d 779.)

A similar act in Nebraska was held invalid as being in violation of a specific provision of the constitution to the effect that the credit of the state shall never be given or loaned in aid of any individual, association or corporation, it being further held that such provision was applicable to all subdivisions of the state. (*State ex rel. Beck v. City of York*, 164 Neb. 223, 82 N. W. 2d 269.)

On the other hand, for decisions directly to the contrary, see *Faulconer v. City of Danville*, 313 Ky. 468, 232 S. W. 2d 80; *Holly v. City of Elizabethton et al.*, 193 Tenn. 46, 241 S. W. 2d 1001, and *Wayland v. Snapp*, —— Ark. ——, 334 S. W. 2d 633.

It will be noted that provisions of the Idaho, Florida and Nebraska constitutions specifically prohibit the loaning of credit by the state or a subdivision thereof—as the case may be—to any corporation, whereas our applicable provision (section 5, article 12, above) provides merely that the power of a city to loan its credit "shall be so restricted as to prevent the abuse of such power."

The matter before us, therefore, narrows down to the question whether the act under consideration contains restrictions to prevent cities from abusing their power to loan their credit—if in fact it may be said their credit is "loaned" by taking advantage of the provisions of the act. In the quotations from the Hines and Kansas City cases, above set out, it was said that our constitutional provision is addressed to the wisdom and conscience of the legislative branch of our state government, and that when a law is passed embracing any

of the subjects mentioned in the provision it is the duty of the court, when called upon, to determine whether it contains restrictions, and if it does contain them the law must be held to be valid, and that whatever the legislature determines to be a sufficient restriction, if it be a restriction at all, must be final.

In section 1 of the act the legislature, in effect, has said that the encouragement of industrial development so as to promote the general welfare of the citizens of the state, is a public purpose and the public policy. Section 2 of the act authorizes a city to proceed only in the event it is found by the governing body that the welfare of the city will be promoted. Section 3 of the act contains certain restrictions with respect to agreements entered into by a city, and section 4 contains further limitations and restrictions and the provision that "said bonds shall not in any respect be a general obligation of such city, nor shall they be payable in any manner by taxation." Other sections of the act contain further limitations and restrictions.

In the above-mentioned Kansas City case (149 Kan. 252, 86 P. 2d 476) it was said:

"An examination of the statute under which the challenged proceedings are being undertaken will reveal a number of restrictions which the legislature must have deemed sufficient to prevent the defendant city from abusing the corporate powers vested in it, and the legislative wisdom on this subject is not open to judicial review." (p. 255.)

And so here. The act is not invalid on either the first or fifth grounds urged by the state.

## II.

It is contended that section 2 of the act, which authorizes the construction of facilities "in any city or its environs without limitation as to distance," constitutes an unlawful delegation of legislative authority to the cities in violation of section 1, article 2 of the constitution, which provides that "the legislative power of this state shall be vested in a house of representatives and senate."

In this connection several unrealistic and unreasonable illustrations are suggested—such as the city of Pittsburg endeavoring to build a facility at Goodland—several hundred miles distant. This argument overlooks the ordinary meaning of the words "or its environs"; that facilities can be constructed only in the event the governing body finds that it would promote the welfare of the city, and, further, that the legislature and the people have the right to

assume that public officials will exercise their express and implied powers fairly, honestly and reasonably. It is quite true that in delegating powers the legislature must fix adequate general standards, but in many instances the filling in of details must, in the very nature of things, be left to the local authorities. (*Coleman v. Newby*, 7 Kan. 82, 88; *State, ex rel., v. City of Topeka*, 176 Kan. 240, syl. 2 and 3, 270 P. 2d 270; *State, ex rel., v. Urban Renewal Agency of Kansas City*, 179 Kan. 435, 440, 441, 296 P. 2d 656.

The act is not invalid on the ground asserted.

## III.

It next is contended that the act is invalid as being in violation of section 16, article 2 of the constitution, which provides that no bill shall contain more than one subject, which shall be clearly expressed in its title.

It is argued that the title of the act refers only to agricultural, commercial, industrial and manufacturing facilities—whereas sections 1 and 2 of the body of the act enumerate facilities for natural resources and recreational development, in addition thereto—and therefore the body of the act is broader than its title.

It also is argued that sections 1 and 2 of the act provide that cities may enlarge and remodel buildings, but that the title states that cities may only purchase, construct, reconstruct, equip, maintain and repair buildings.

Some mention also is made of the fact that sections 4 and 5 of the act provide for methods of retiring revenue bonds issued by the city, but that the title provides only, in an indirect way, for their issuance.

It is not contended that the act contains more than one subject—and in fact it does not. We are advised that the words "natural resources" and "recreational development" were inserted in the body of the act by way of an amendment when the senate was sitting as a committee of the whole. Due to the inept language, they do, perhaps, create some ambiguity. On the other hand, one might build a building for development of natural resources or a building for recreational purposes, but not one for natural resources or recreational development.

With respect to the second point under this heading, it is submitted that enlarging and remodeling buildings means the same as reconstructing or repairing buildings.

And concerning the third point under this heading, it is only reasonable to assume that reference to bonds—revenue or otherwise

—raises an inference in any ordinary person's mind that it follows that such bonds would some day be retired by payment. To the average person a bond simply means a pledge to pay at some particular time and at a stated rate of interest.

It is well settled that the title of an act need not be a synopsis or abstract of the entire act in all its details. (*The State v. Barrett,* 27 Kan. 213, syl. 3, 7 and 8; *Water District No. 1 v. Robb,* 182 Kan. 2, 9, syl. 2, 318 P. 2d 387.)

The act is not invalid as being in violation of the mentioned constitutional provision.

## IV.

It also is contended the act is void in part wherein it attempts to authorize cities to issue bonds for an unlawful purpose—the maintenance of facilities.

The argument is too technical and is entirely lacking in merit. The word "maintenance," as so used, is held to be synonymous with "taking proper care of," "repairing," or the like. On the subject see *Concordia-Arrow Flying Service Corp. v. City of Concordia,* 131 Kan. 247, 250, 289 Pac. 955.

## VI and VII.

It next is contended that the authority to issue bonds at any rate of interest, over any period of time and for any amount, violates section 1, article 2 of the constitution, above, which, as stated, provides that the legislative power of this state shall be vested in a house of representatives and senate, and also that the act is void as being vague, ambiguous and indefinite in that, as contended, section 4 of the act states the bonds and interest shall be paid solely out of the rentals charged by the city, whereas section 5 of the act states that the facility may be pledged, together with the net earnings, to the payment of the bonds and interest thereon.

From the brief it is apparent these points are not seriously urged, and, without further discussion, they are held to be without substantial merit.

## VIII.

Finally, it is contended the act violates the due process sections of our constitution (sections 1, 2 and 18 of the bill of rights) and the fourteenth amendment to the federal constitution by taking property without due process of law.

It is conceded that under the act there is no "taking of property" in the ordinary sense of the word, such as by eminent domain—but

it is argued there is a "taking" in that the "credit" of a city belongs to its inhabitants and when that credit is abused by being "loaned" it amounts to a "taking of property" from such inhabitants. This contention, of course, presupposes that proceedings under the act will result in an abuse of the power of a city to loan its credit. It has not been shown that the act violates due process provisions or that it abridges the privileges or immunities of citizens, or that it deprives any person of his property or the equal protection of the law.

This contention also is without substantial merit.

## IX.

Section 5, article 12 of our constitution, heretofore quoted, and with which this case is chiefly concerned, was amended by vote of the people at the 1960 general election by the adoption of the so-called "Home Rule Amendment." This amendment, not yet appearing in our general statute books, may be found at Chapter 182, Session Laws of 1959, and became effective on July 1, 1961. The state urges that in the event the act here under consideration be held unconstitutional as being in violation of section 5, article 12, above, its invalidity is not to be held cured by the subsequent taking effect of the "Home Rule Amendment," which, the state concedes, contains no such prohibitions as those found in section 5, article 12.

As previously stated, the act in question became effective on March 29, 1961, on which date section 5, article 12 was a part of the constitution. Our decision is that the act does not violate that constitutional provision. Therefore, any discussion of the effect of the "Home Rule Amendment" would be purely academic and we express no opinion thereon.

## X.

The determination whether the act under consideration so restricts cities in loaning their credit "as to prevent the abuse of such power" (section 5, article 12) is considered to be the most serious question in this case. In reaching the conclusion that the act is not invalid, let it be said that we have not closed our eyes to arguments of the state that the provisions of the act "lead down the road to socialism" and conceivably could bring about chaos and disastrous results in municipal affairs with respect to bond issues. And neither do we

subscribe to the view that "constitutional law," at any given time, is the then current theory of what "ought to be done" in view of the prevailing practical and economic philosohpy of the times.

While unconstitutional exercise of power by the legislative branch of the government is subject to judicial restraint, the only check upon our own exercise of power is our own sense of self-restraint. From a purely legal standpoint, the rule in this state, as elsewhere, is that courts are concerned only with the power to enact statutes and cannot concern themselves with the wisdom of legislative acts. Courts neither approve nor condemn legislative policy, and their sole function is to determine the validity of a challenged act when measured by applicable constitutional provisions. (*State, ex rel., v. Sage Stores Co.,* 157 Kan. 404, 413, 141 P. 2d 655, 323 U. S. 32, 89 L. Ed. 25, 65 S. Ct. 9; *State, ex rel., v. Board of Regents,* 167 Kan. 587, 596, syl. 4, 207 P. 2d 373; *State, ex rel., v. Russell,* 171 Kan. 709, 237 P. 2d 363.) For the removal of unwise laws from the statute books, appeal lies not to the courts but to the ballot and to the processes of democratic government.

In conclusion, we again quote from *State, ex rel., v. Kansas City,* 149 Kan. 252, 86 P. 2d 476:

"An examination of the statute under which the challenged proceedings are being undertaken will reveal a number of restrictions which the legislature must have deemed sufficient to prevent the defendant city from abusing the corporate powers vested in it, and the legislative wisdom on this subject is not open to judicial review." (p. 255.)

Notwithstanding there are members of this court who entertain serious misgivings and doubts as to the wisdom and propriety of the act under consideration—it nevertheless is held not to violate the constitution on any of the grounds asserted.

The judgment is therefore affirmed.