445 P.2d 994

Clyde J. ALLEN, for himself and all other residents and taxpayers of Tooele County, Utah, similarly situated, Plaintiff and Appellant,

v.

TOOELE COUNTY, a political subdivision of the State of Utah, etc., et al.; Energy Leasing Services, Inc., a Delaware corporation; and the Magnesium Project, a joint venture, Defendants and Respondents.

No. 11297.

Supreme Court of Utah.

Oct. 14, 1968.

Bryce E. Roe, Ralph L. Jerman, Salt Lake City, for plaintiff and appellant.

H. R. Waldo, Jr., J. Wendell Bayles, of Jones, Waldo, Holbrook P. McDonough, Salt Lake City, Gordon Hall, Tooele County Atty., Tooele, for defendants and respondents.

CROCKETT, Chief Justice:

Clyde J. Allen sues as taxpayer of Tooele County (and for others similarly situated)

challenging the constitutionality of the Utah Industrial Facilities Development Act, Chapter 29, S.L.U.1967.[1] The district court rejected his contention and held the Act valid. He appeals.

The stated purpose of the Act referred to is to encourage and promote the greater industrial development in the state of Utah.[2] In pursuance of this purpose and in accordance with the provisions of the Act, Tooele County, acting through its commissioners, and The Magnesium Project, a joint venture, consisting of the National Lead Company, a New Jersey corporation, and H-K Inc., a Utah corporation, have entered an arrangement whereby Tooele County will obtain finances and construct a plant to extract mineral residues of the Great Salt Lake, which will be leased to and operated by The Magnesium Project. The money to construct the plant is to be raised by revenue bonds issued by the County as allowed by Sec. 11-17-3 of the Act, which bonds are to be paid off by rentals from leasing the plant.

■ Plaintiff's main argument against this project is that the Act is in violation of Sec. 31 of Art. VI of the Utah Constitution:

The Legislature shall not authorize the State, or any county, * * * to lend its credit * * * in aid of any * * * corporate enterprise or undertaking.

Both from the language just quoted, and from the constitutional history, it is evident that the framers were attempting to prevent a resort to the taxing power of the state for the benefit of private enterprise.[3]

■ The County could be deemed to "lend its credit" to the enterprise only if the County might in some eventuality be required to pay the obligation.

■ It seems evident that the legislature in framing this Act, and the defendants in planning this project, have been cognizant of the above constitutional interdiction and have exercised care to avoid collision with it by safeguarding against any possibility that Tooele County or its taxpayers will be charged with any obligation from this contract. The contracts provide that the construction of the plant is to be financed by the bonds issued by the County, and that the bonds are to be paid only by the rentals

1. Now codified as Secs. 11-17-1 through 15, U.C.A.1953 (1967 Supp.).
2. Sec. 1 of the Act.
3. See proceedings of Constitutional Convention, Vol. 1, p. 953. David Evans: "What is loaning the credit of a State or county or municipality? In short, it means that any corporation or enterprise, desiring to start a business, and for the purpose of aiding it, the State endorses or rather guarantees the bond or paper of such individual or corporation * * *"; and at p. 979: Samuel R. Thurman: "It is not a question of the State being permitted to make donations and give bonuses from time to time * * *, *but it is a question of mortgaging the State, not for the payment of its own debt but for the payment of the debt of another.*"

received from leasing the plant. And to further safeguard against any misunderstanding, it is to be stated on the face of the bonds that in no event will they constitute an indebtedness of Tooele County or a charge against the general credit or taxing powers of the County, all of which is in accord with the provisions of the Act. Inasmuch as the bonds are payable only out of the income to be derived from leasing the plant, and no resort can be had against the County or its taxpayers, it is our opinion that the project is not a "lending of credit" of the County as was intended to be prohibited by Sec. 31 of Article VI of the Utah Constitution.

The foregoing conclusion harmonizes with the "special fund doctrine" which has long been recognized in the law of this state. Its rationale is that bonds which are to be paid off *only* out of money derived from the project they are issued on, and not payable from taxes, are not debts within the meaning of the constitutional debt limitation on counties.[4] What we have just said is also applicable to the plaintiff's argument that the issuance of the revenue bonds will lessen the borrowing power of the County and thus result in an increased burden upon its taxpayers. There being no possibility of it becoming a debt of the County, there is no logical reason to believe that it will lessen its borrowing power, nor that it will increase the burden upon its taxpayers. In fact, the reverse is true. The establishment of a working industrial plant, with its properties and the income it produces, should result in increasing the taxes collectible by the County in several ways. This ought to lessen the plaintiff's tax burden over the long run. And because borrowing power is based on income, it seems more likely to increase the County's borrowing power than to diminish it.

Plaintiff urges that even if the "special fund doctrine" discussed above applies, it is violated if a county mortgages property acquired by tax money to insure the payment of the bonds. Scrutiny of the argument thus stated defeats itself. There is to be no property acquired by tax funds. In addition to what has been said above to the effect that the project is to be financed by the anticipated rentals from the plant, it is further provided that if any County funds are expended, they are to be reimbursed out of the proceeds of the bonds. It is not for us to base a decision on a supposition that there may be some deviation from this plan, or that there may be some violation of the Act. If there is any such, it would be an act not in conformity with the law, for which the appropriate

4. See Barnes v. Lehi City, 74 Utah 321, 279 P. 878 (1929); Fjeldsted v. Ogden City, 83 Utah 278, 28 P.2d 144; and Barlow v. Clearfield City, 1 Utah 2d 419, 268 P.2d 682.

remedy could be sought, but that would not make the Act unconstitutional, nor the project itself unlawful.

█ Another attack plaintiff makes upon the Act is that Sec. 11–17–10 thereof grants a partial exemption from property taxes. To test the validity of this contention we look to the reality rather than the superficiality of the situation. In doing so it will be seen that in the final analysis the lessee will pay a tax equivalent to the tax it would if it owned and operated the plant in Tooele County. The pertinent portion of the Act is Sec. 11–17–10:

> * * * All property acquired or held by the *county or municipality* under this act is declared to be public property used for essential public and governmental purposes; and all such property and bonds issued under this act and the income from them *are exempt from all taxes* imposed by the state of Utah, any county, any municipality, or any other political subdivision of the state. *This exemption shall not extend to the interests of any* private person, firm, association, partnership, corporation or other *private business entity* in such property or in any other property such business entity may place upon or use in connection with any project, all of *which*

*shall be subject to the provisions of section 59–13–73 and all other applicable laws*, nor to any income of such private business entity, which, except as provided in this section for such bonds and the income from them, shall be subject to all applicable laws regarding the taxing of such income.

As will be seen from the emphasized language, the exemption applies only to the county (or municipality), and that it expressly does not apply to any private enterprise. The latter "shall be subject to the provisions of Sec. 59–13–73 and all other applicable laws." That section imposes "a tax upon the possession or other beneficial use * * * of any property, real or personal, which for any reason is exempt from taxation, when such property is used in connection with a business conducted for profit"; and the following section, 59–13–74, provides that the tax shall be "in the same amount * * * as the ad valorem property tax would be if the possessor or user were the owner thereof." So there is actually no tax exemption to the lessee.[5]

Inasmuch as all persons similarly situated would be treated equally under this statute, we see no merit to plaintiff's further arguments relating to inequality and discrimination in taxation.[6]

---

5. See Thiokol Chemical Corp. v. Peterson, 15 Utah 2d 355, 393 P.2d 391, cited and relied on in Marquardt Corp. v. Weber County, 360 F.2d 168 (10th Cir. 966).

6. See State v. Mason, 94 Utah 501, 78 P.2d 920, 117 A.L.R. 330; that the authority of the legislature to exempt from income tax the interest on bonds issued

▐▌ The final point we comment on is the plaintiff's charge that the Act must be held invalid because of the lack of a substantial public purpose. This question has been determined at three levels preceding the prerogative of this court to make such a determination. The first is the legislature; the second is the county commission; and the third is the trial court. All of them appear to have regarded industrial development as a proper public purpose. In deference to those prior prerogatives, this court would not upset such a determination except upon a persuasive showing that it was so clearly in error as to be capricious and arbitrary,[7] a circumstance we do not find present here.

The conclusion we have reached herein is in accord with the majority and what we regard as the better considered decisions which uphold similar statutes,[8] though we are aware that there are some decisions to the contrary.[9]

The judgment of the trial court holding the Industrial Development Act constitutional is affirmed. The parties to bear their own costs.

TUCKETT and ELLETT, JJ., concur.

CALLISTER, Justice (concurring in the result):

I concur in the result, but do so reluctantly. Let's face it. The statute under consideration is nothing more than a "gimmick" whereby a private concern is able to finance the project with cheap money. This is possible by reason of a loophole in our complex federal income tax law. It would seem that Tooele County is lending only its name and not its credit.

HENRIOD, Justice (dissenting):

I dissent, with some reluctance, since it appears from certain estimates appearing in the record, that there may be some substantial benefits arising from *this particular proposed project* inuring to the inhabitants of Tooele County in the way of jobs, housing, income and the like which presently are not extant. Significantly, however, there is little or no evidence, estimatewise or otherwise, as to the damage such a project could do taxwise to all the taxpayers of Utah,—not only those in Tooele County. All of the above has to do only with the

by subdivisions of the state provided by 11–17–10 is merely an exercise by the legislature of the power granted them, see Sec. 3, Art. XIII, Utah Constitution.

7. See Carmichael v. Southern Coal and Coke Co., 301 U.S. 495, 57 S.Ct. 868, 81 L.Ed. 1245 (1937); and see also Lehi City v. Meiling, 87 Utah 237, 48 P.2d 530.

8. E.g., Green v. City of Mt. Pleasant, 256 Iowa 1184, 131 N.W.2d 5 (1964); State

ex rel. Ferguson v. City of Pittsburgh, 188 Kan. 612, 364 P.2d 71 (1961); Carruthers v. Port of Astoria, Or., 438 P.2d 725 (1968); State v. Barczak, 34 Wis.2d 57, 148 N.W.2d 683 (1967); Powers v. City of Cheyenne, 435 P.2d 448 (Wyo. 1967).

9. E.g., State v. Town of North Miami, 59 So.2d 779 (Fla.1952); State ex rel. Saxbe v. Brand, 176 Ohio St. 44, 197 N.E.2d 328 (1964).

economics of the project,—*not* the constitutionality of the act nor the question of governmental authority or purpose.

Let it be said at the outset, that S.B. 187, subject of this litigation, sped through three readings of the House and Senate, with hardly a murmur, and was passed by both houses on the last legislative day in the last legislative gasp one or two hours before sine die,—without any visible, risible or other signs of legislative debate,—all of which is evidenced by the journals of both houses. The bill became effective on May 9, 1967. Thereafter, Tooele County Commissioners met with no one other than those having to do with the project which they proposed and outlined to the Commission, and there is nothing in the record to indicate that the Commission sought out or consulted with anyone except respondents who were promoting the project. Hence, no one with private risk capital who might have been interested in promoting the project without the benefit of a municipal bond issue or private tax advantage, seemed to have an opportunity to do so. Had such private risk capital been obtained without the tax exemption on the proposed bonds, it takes little imagination to conclude that Tooele County could have benefited to the same extent, and income tax revenue would have been available to the State of Utah. It is no answer to say that the State would have gained nothing anyway, because no venture likely would have been proposed without S.B. 187,—which is conjectural. Other multi-million dollar ventures have made the grade in this State without S.B. 187, and without the county's putting its name on negotiable bonds in large type, only to belie such representation by way of fine print, involving a 72-page "Mortgage and Indenture of Trust," and a 46-page "Lease and Agreement," neither of which is in the bonds to be issued except by reference and generalization. The form bond incorporated therein is entitled as follows:

"UNITED STATES OF AMERICA
STATE OF UTAH
COUNTY OF TOOELE,"

and promises to pay the bearer of the bonds, issued *to acquire lands and construct facilities*, etc., to lease to one of the respondents, Energy Leasing Services, Inc., a private enterprise. The large print makes it appear that Tooele will pay off the bonds. The small print seems to say it will pay off *if* the County acquires the property. The question immediately is raised: What if Tooele *cannot* acquire the necessary property or does not see fit to do so,—perhaps because of change of politics or personnel? Who then pays the bondholders, with interest? If this is not at least a potential lending of the credit of the County for private enterprise and the project fails because of inability of the County to purchase the property, inertia of the perhaps newly-elected county commis-

sioners, or perhaps the refusal of a lessee to accept the land and facilities because of inadequacy or non-feasibility for the contemplated operation, who, pray tell, is to pay off the bonds that in the last analysis, are bottomed on conjectural factors? You and I know who will have to pay—the taxpayers of Tooele County.

This has been a "rush" situation from beginning to end. After a special calendar privilege was granted, it took but 14 days to read and digest lengthy briefs, a hundred or more cases cited therein, an inordinately protracted contract and lease, and a transcript that hardly could be dubbed a brochure, for the author of the main opinion to pen his decision. Thereafter, counsel for both parties asked for special hearings, and obtained them, in which they pressed for a quick decision. The reason: That the bonds, they said, would have to be printed post haste if we validated the statute, and sold before the end of the year, else the promoters would suffer a loss of many hundreds of thousands of interest dollars, since federal action recently passed would prohibit a project of this type for anything over $5,000,000 and S.B. 187 would be ineffective for anything over that amount after the first of the year. The above is simply background for the economic urgency to approve the project. These facts, being of an economic nature, have no pertinence to the constitutionality of S.B. 187,—the only real issue we have before us.

Now: As to the main opinion: It says:

1) That S.B. 187's purpose is to promote more industrial development, which is true; that to accomplish this purpose, Tooele and the Magnesium people have entered into a contract, *for Tooele County to raise the necessary funds*, which is true; it then says that "the money to construct the plant is to be raised" by revenue bonds *issued by the County* as "allowed by Sec. 11–17–3 of the Act, which bonds are to be paid off by *rentals* from *leasing the plant*." This is the worst kind of non sequitur and ipse dixit since it assumes success of the project and superiority of the "Act" over the constitutional interdiction against pledging the credit of the County. This is followed by the statement that "The County could be deemed to 'lend its credit' * * * only if the County might in some eventuality be required to pay the obligation." The *obvious* answer to that is that if the County does not wish to lend its *credit*, why should it be willing to lend its good name to give a private enterprise a tax advantage on an assumption that in some way or another such a discriminatory loan of its name just might result in a public benefit; but which in its failure might destroy not only private but public confidence in its good name. Pose this quare: Suppose the project went broke before it began, or its conception resulted in a still birth, or that the county commissioners all dropped dead by nerve

gas, as did the sheep, before any property could be or was purchased?

The main opinion goes on accurately to quote Art. VI, Sec. 31, of the Constitution, volunteering that the framers evidently were putting the skids under any attempt to use tax money in aid of private enterprise. The section does not exactly say what the Chief Justice says it means, although it is conceded that there are they that agree with him,—certainly the respondents in this case. Others have said lending of credit is something else than giving or lending tax money in aid of private enterprise. If the framers had in mind tax money only, it would have been a simple matter to have said, instead of lending credit, that the legislature "shall not authorize the State, or its subdivisions to lend or donate any *tax money*" in aid of private enterprise.

The main opinion then says that the provisions of the contract are very carefully drawn to prevent constitutional pitfalls, "all of which is in accord with the * * * Act." The question is not whether the contract complies with the Act, but whether the Act complies with the Constitution— questions as far apart as the poles. The opinion footnote-wise, picks out of context selected statements by a couple of members of the Convention.

The optimism of the main opinion to the effect that the establishment of a working plant should result in increasing county taxes is somewhat illusionary, since, although this particular project might support such a conclusion, others may not, and it is strictly a matter of economics and speculation, based on assumption, and having nothing to do with the validity of the legislation.

The opinion relies heavily for its support on an unwarranted conclusion that the lessees here will pay as much to the County as they would if they were the owners of the property, since the Act provides that it is subject to the provisions of 59–13–73. This conclusion is somewhat of a delusion and a snare, since the Chief Justice has not called attention to 59–13–75 which says that any tax unpaid by the lessee is subject to the same collection treatment as those owning the property "except that such taxes shall not become a lien against the property, and no such tax-exempt property may be attached, encumbered, sold or otherwise affected for the collection of the tax imposed hereunder." This simply means that anyone promoting a deal with county or city commissioners to operate a supermarket under S.B. 187, may use not only money from bondholders but can use a county's good name to accomplish the result by having procured against him only a personal money judgment. His bankruptcy may render the judgment worthless, and there is no risk capital property that the county can look to in order to collect the

accrued taxes. In other words, the backbone and theory of tax collection are emasculated, and the county may have on its hands and books a worthless shell of a building, and possibly a shell of its former self. This seems to me to be a lending of credit, with the ultimate result that tax money could or potentially could be employed to pull the county out of a fiscal hole. This seems to be the more ominous, since S.B. 187 does not restrict the counties from entering into literally hundreds of ventures, ranging from egg-beater plants, securities selling schemes, land improvement housing projects on underwater lands of Great Salt Lake, ad infinitum to an attempted restoration of Saltair. In the meantime the county may have taken off the tax rolls valuable property, which, in a given case, under S.B. 187, could be tied up for many years under the guise of industrial development, which may have as good a chance for undevelopment as it does for development. There is no question in my mind that permitting a private enterprise to use the name of a county for the purpose of issuing bonds for a private venture is not out a lending of credit in the constitutional sense. To hold otherwise would be to lend incredibility to a scheme in the common sense as well as the constitutional sense.

Respondents' brief largely talks about the public benefits to be derived from this venture under S.B. 187, quoting copiously from the testimony of professors, analysts and even self-serving employees of the company promoting this venture. Little or nothing is said about economic disadvantages to the taxpayers. Either way, such testimony seems to be inadmissible, since it is no concern of this Court what might or might not eventuate economically. Our only concern is to look at the Act to see if its terms satisfy constitutional requirements. This is the only issue in this case sans the hearts and flowers and the violin.

Repondents assert that there is no evidence that they could finance the project without S.B. 187. By the same token there is no evidence that a half billion dollar corporation could *not* do so. Either way, this again is economics, and has nothing to do with this case which has only to do with the interpretation of a statute.

Respondents point to six Utah cases in support of their contention that the instant case is governed by the so-called "special fund" principle. All of these cases have to do with obtaining funds to provide *services to the inhabitants, which the municipal government is duty-bound to supply,* such as electric and water facilities, which the city operates for the good of its citizenry. The special fund theory seems to be inapropos here, since the city is not bond-funding to furnish necessary services it is required to provide in its governmental role. In the instant case, the municipal government is not operating the magnesium plant and

could not do so if it wanted to, since it is a private, commercial venture for profit. The main thrust of respondents and the main opinion is that if any private enterprise proposes a project, which may provide jobs, etc., a county should be able to fund the project under a "special fund" theory, or lend its good name as primary obligor to take a calculated risk on estimates of success, without taking into account any of the incalculables such as removing property from tax rolls, denying the state and/or county of property and income revenue, simply because a project sounds good to a few county commissioners, whose discretion under S.B. 187 may be exercised without restraint of any kind.

A pretty good argument rebutting respondents' contention is stated in appellant's brief when it is urged that in the constitutional debates:

The section in question was proposed by Mr. Varian whose comments included the following:

"The purpose of my section is to prohibit the lending of credit *in any way* for the furtherance of such enterprises as are indicated (Page 952) * * * It is a solemn duty, sir, that we have, to guard the public revenue and the public property from spoliation. We may not farm it out through future generations to be disposed of for other than the *necessary purposes of government.* * * *"

Another of the proponents, Mr. Richards, at Page 913 of the proceedings quoted Cooley, the renowned constitutional lawyer, as follows:

"It has been well and forcibly said that individuals and corporations embark in manufactories for the purpose of personal and corporate gain. Their purposes and objects are precisely the same as those of the farmer, the mechanic, or the day laborer. They engage in the selected branch of manufactories for the purpose and with the hope and expectation not of loss, but of profits. The general benefit of the community resulting from every description of well regulated labor is of the same character, whatever may be the branch of industry upon which it may be expended. All useful labors, no matter what the field of labor, serve the state by increasing the aggregate of its profits, its wealth. There is nothing of a public nature."

The arguments for some form of public aid to private industry are the same today as when the constitution was being considered and adopted. * * *

In State v. Town of North Miami, 59 So. 2d 779 (Fla.) 1952, it was said in a similar case that:

Every new business, manufacturing plant, or industrial plant which may be established in a municipality will be of some benefit to the municipality. A new

super market, a new department store, a new meat market, a steel mill, a crate manufacturing plant, a pulp mill, or other establishments which could be named without end, may be of material benefit to the growth, progress, development and prosperity of a municipality. *But these considerations do not make the acquisition of land and the erection of buildings, for such purposes, a municipal purpose.* [Emphasis added.]

and in Wadsworth v. Santaquin City, 83 Utah 321, 28 P.2d 161 (1933), it was said that:

Nevertheless, the bonds must be paid when due, or city credit will be impaired. With noiseless foot and steady tread the day of reckoning inevitably comes to demand its toll. To a city, no less than to a state or individual, untarnished credit and an honored name are of inestimable worth. No wealth or power which may come to a community is of more lasting importance than the good name it maintains by keeping its faith unbroken in meeting all of its engagements and obligations. In spite of the fact that full faith and credit of a city is not pledged to payment of the revenue bonds, no prudent city will permit its promise to pay to go unfulfilled where it has received and enjoyed the fruits of the obligation.

Again, in State ex rel. Saxbe v. Brand, 176 Ohio St. 44, 197 N.E.2d 328, a similar case involving revenue bonds, it was stated:

The sale of revenue bonds of the state to raise money necessarily involves a borrowing of money even though no indebtedness of the state results. If the bonds are not paid, the borrowing power of the state will as a result be adversely affected, even though the bonds do not represent a debt of the state. The borrowing power of the state is related to the taxing power because, to the extent that the state's borrowing power is lessened, a greater burden will be placed upon its taxing power.

In State ex rel. Beck v. City of York, 164 Neb. 223, 82 N.W.2d 269 (1957), it was said that:

It is true that the revenue bonds are not a general liability of the city and they are not subject to payment through the exercise of the taxing power. *But they do cast burdens upon a city with reference to their issuance and payment.* The city and its officers are charged with the duty of fixing and collecting the rentals from which the revenue bonds are to be paid. This necessitates the execution of leases, the fixing of rentals, the taking of chattel mortgages on equipment to secure payment of rent, the providing of insurance coverage, and the determination of payments to be made in lieu of taxes. It imposes duties and responsibilities upon the city and its officers on matters which are private rather than public in character. *The is-*

*suance of the bonds in the name of the city for the payment of the cost of the project evidences the fact that the credit of the city has been extended. The city is the payer of the bonds and it is primarily liable for their payment. The bonds become the obligations of the city. The fact that the means of payment is limited does not make it any less so. A failure of payment is a default by the city. The constitutional prohibition does not infer that the credit of the State or its political subdivisions may be given or loaned except when a general liability exists.* The prohibition clearly provides that the credit of a State may not be given or loaned to an individual, association, or corporation under any circumstances. * * * *It seems clear to us that the revenue bonds are issued by the city in its own name to give them a marketability and value which they would otherwise not possess.* If their issuance by a city is an inducement to industry, some benefits must be conferred, or it would be no inducement at all. Such benefits, whatever form they may take, necessarily must be based on the credit of the city. The loan of its name by a city to bring about a benefit to a private object, even though general liability does not exist, is nothing short of a loan of its credit. [Emphasis added.]

In 1959 Idaho enacted an industrial development act very like Utah's. The act was held unconstitutional in Village of Moyie Springs, Idaho et al. v. Aurora Manufacturing Co., 82 Idaho 337, 353 P.2d 767 (1967), in a lengthy opinion in which the court considered all of the customary arguments. With respect to "lending of credit" it said:

> It is obvious that one of the prime purposes of having the necessary bonds issued by it in the name of the municipality is to make them more readily salable on the market. Thus, the credit of the municipality is extended in aid of the project, regardless of the limitations placed upon the remedy of the purchaser. * * *

I would like to point out that the Act, which presents a myriad of complex and constitutionally questionable problems, is offensive on the ground of vagueness and almost ridiculosity, e. g.:

The county can buy property in other counties, under this Act, and thus take such property off the latter's tax rolls, thus denying sister counties from Pickleville to Mexican Hat from taxing erstwhile taxable property. In this way, for example, under S.D. 187, Salt Lake County could issue bonds having the effect of stripping outlying counties,—28 of them, if you please,

and without their consent, of a substantial source of tax revenue vitally necessary to support their own economy, governmental functions and their own inhabitants. All this for the alleged purpose of providing for questionable industrial benefits for one county,—but what is more important,—to aid a private industry to save interest and avoid taxes, where agreed rentals may never pay off the bonds, where property is taken off the tax rolls, possibly in perpetuity,—all accomplished by a possibly uninformed small group of men on a commission, sensitive and gullible, possibly, to salesmanship, sweet talk, and without seeking bids and without any right in the taxpayers by referendum or other protest of any kind to prevent the project,—albeit its development may be quite hazardous and ruinous. This is why you and I have to pay more taxes, so that rich corporations, etc., buying the bonds are tax exempt and need not sweat too hard to fill out tax returns showing no taxable income, come April 15 of each year. The County Commissioners obviously are blind to the fact that this project can rob the County of revenue security and at the same time increase their own income tax burden by relieving others of that same obligation. After December 31, this year, the very thing this court now approves, cannot be done. What now, Brown Cow?