Vernon B. Romney, Atty. Gen., William T. Evans, Asst. Atty. Gen., Salt Lake City, for defendants and appellants.

E. Craig Smay and Gerald R. Miller of Van Cott, Bagley, Cornwall & McCarthy, Salt Lake City, for plaintiff and respondent.

**UTAH HOUSING FINANCE AGENCY, Plaintiff and Respondent,**

v.

**Herbert L. SMART, Director of Finance of the State of Utah, and David Smith Monson, Auditor of the State of Utah, Defendants and Appellants.**

**No. 14924.**

Supreme Court of Utah.

March 14, 1977.

ELLETT, Chief Justice:

In 1975 the Utah Legislature passed the Utah Housing Finance Agency Act.[1] The Act creates the Utah Housing Finance Agency, a body corporate and politic of the State, Respondent herein (hereafter "Agency"). It has the power to sue and be sued. Generally, the Act creates an Agency composed of state officials and public members appointed by the Governor, upon whom are conferred powers to deal with the problems of an inadequate supply of decent, safe, sanitary housing for persons of low and moderate income in Utah by increasing the availability of mortgage funds for such housing.

The Act permits the Agency to obtain funds by the sale of notes and bonds and

1. L.1975, ch. 190, codified as 63–44a–1, U.C.A. 1953, Replacement Vol. 7A, (1975 Pocket Supp.).

other obligations. Such notes and bonds, income therefrom, and payments thereon, together with all agency property, are exempt from taxation. The Agency is then commanded to make such tax exempt funds available on a low interest basis for the financing of the purchase, construction, or rehabilitation of housing for low and moderate income persons.

The Agency may adopt a number of techniques for making its funds available. It may make direct loans through qualified mortgage lenders to individuals for purchase, construction, or rehabilitation of housing. It may create a housing rehabilitation fund for direct loans for rehabilitation of low and moderate income housing. It may make loans to local housing authorities for purchase or construction of low and moderate income housing. It may purchase loans from qualified mortgage lenders, providing that the funds paid the lender by the Agency will be used by the lender to make low interest mortgages to low and moderate income persons as defined by the Agency.

Presently, the Agency is in the process of finalizing rules and regulations for the implementation of its initial program. It desires to make an initial sale of bonds in order to obtain funds to be used to purchase mortgages, and has undertaken preparations for such a sale.

At the time of passage of the Act, the legislature appropriated to the Agency the sum of $200,000 to be used to establish a general operating fund and $300,000 to establish a capital reserve fund. The Agency has requested that this sum be disbursed to it from the State Treasury, to be used to cover initial expenses and to implement its initial program. The State Director of Finance and the State Auditor refused to take any steps to process the request of the Agency for funds because of substantial questions of the constitutionality of the Act.

The Agency filed an action for declaratory judgment and mandamus to have the Act declared constitutional and to require the appellants to take necessary steps for the disbursal of the funds. The Third Judicial District Court granted the Agency's requested relief and appellants brought this appeal. They claim that the Act and the appropriations thereunder are unconstitutional because no public purpose is served.

Many states with similar statutes have held that a public purpose is served by providing for low income housing acts.[2]

The Act contains a declaration of public purpose in Section 63–44a–2, U.C.A.1953 (1975 Pocket Supp.). In that section, the legislature declares it the policy of the State to assist the provision of decent, safe, sanitary housing for the citizenry where private institutions fail to do so. There is then contained a statement that such a failure has occurred in that a lack of available financing has caused a decrease in housing starts and in the transferability of existing housing, with a resulting serious shortage of decent housing for persons of low and moderate income. Such a shortage, the legislature finds, leads to unemployment in the housing industry and to the creation of blight and slums. The legislature therefore specifically declares it a public purpose for the State to cooperate with private institutions to increase the amount of reasonably available financing for the construction, purchase, and rehabilitation of decent, low and moderate income housing. Such legislative findings are entitled to great weight and statutes should be sustained unless clearly in violation of fundamental law.[3]

The matter of a serious shortage of safe, sanitary, decent housing for a large seg-

**2.** *California Housing Finance Agency v. Elliott,* 131 Cal.Rptr. 361, 551 P.2d 1193 (1976); *Rich v. State of Georgia, et al.,* 237 Ga. 291, 227 S.E.2d 761 (1976); *In re Constitutionality of ORS 456.720 v. Smith,* Or., 537 P.2d 542 (1975); *West v. Tennessee Housing Development Agency,* Tenn., 512 S.W.2d 275 (1974); *Ver-*

*mont Home Mortgage Credit Agency v. Montpelier National Bank,* 128 Vt. 272, 262 A.2d 445 (1970).

**3.** *Lehi City v. Meiling,* 87 Utah 237, 48 P.2d 530 (1935); 16 C.J.S. Constitutional Law §§ 98 and

ment of the citizenry falls squarely within the police power of the legislature to deal with the health, safety, and morals of the populace. Courts which have discussed the matter indicate numerous ways in which making decent housing more readily available beneficially affects the health, safety and morals of the public.

Making it possible for a greater number of low and middle income persons to purchase homes gives a greater number a stake in society, and encouragement to be productive wage earners, and thus tends to stabilize society.[4]

Increasing the transferability of low and middle income housing by increasing financing therefor, and increasing the availability of funds for home improvements on such housing, tends to prevent the creation of blight and slums and the consequent unsafe, overcrowded conditions which breed crime and disease.[5] This Court has held that the redevelopment of blighted and slum areas is a public purpose for which public funds may be spent.[6]

It cannot be said that the finding of the legislature that a public purpose is served by increasing the availability of financing for construction, purchase, and rehabilitation of low and moderate income housing, is incorrect or unreasonable on its face. Regarding appellants' objection that the Act does not serve a public purpose, then, it remains only to be seen whether the method chosen by the legislature to remedy the problem defined is reasonably calculated to have the desired effect.

The general scheme chosen by the legislature is a common one. Stated briefly, the Agency is authorized to obtain tax free funds by the issuance of bonds and notes, which it uses to provide low interest financing for low and moderate income housing. Debt created by the sale of notes, bonds, and other obligations is payable only out of funds of the Agency, so that such obligations are self-liquidating. At least one court has specifically addressed the problem as to whether such a method is reasonably calculated to serve the public purpose of increasing financing for low and moderate income housing, holding that it is.[7] Generally, the same method was employed by the agencies involved in all of the other sister state cases cited above so that insofar as each finds that a public purpose is served by the legislation there involved, each implicitly finds that raising low interest funds for financing by sale of tax exempt self-liquidating bonds is an acceptably effective means of accomplishing the public purpose. The method is familiar in Utah where it has been approved for various public purposes.[8]

The Housing Finance Agency Act serves a public purpose in that it is intended, and reasonably designed, to alleviate an actual and existing problem having a significant affect upon the public health, safety, and welfare.

Appellants assert that the Act is constitutionally offensive because its operation will confer certain private benefits. There is an obvious private benefit to persons who are able to obtain housing financing through the Agency who would not have been able

---

99; 16 Am.Jur.2d, Constitutional Law, Sec. 144 (1964).

4. *State ex rel. Warren v. Nusbaum*, 59 Wis.2d 391, 208 N.W.2d 780 (1974); *Martin v. North Carolina Housing Corp.*, 277 N.C. 29, 175 S.E.2d 665 (1970).

5. *State ex rel. Warren v. Nusbaum*, supra, note 4; *Main State Housing Authority v. Depositors Trust*, 278 A.2d 699 (Me.1971); *Martin v. North Carolina Housing Corp.*, supra, note 4.

6. *Tribe v. Salt Lake City Corp.*, Utah, 540 P.2d 499 (1975). No. 14924.

7. *West v. Tennessee Housing Development Agency*, supra, note 2.

8. *Tribe v. Salt Lake City Corp.*, supra, note 6 (city urban renewal bonds); *Allen v. Tooele County*, 21 Utah 2d 383, 445 P.2d 994 (1968) (county bonds for industrial development); *Conder v. University of Utah*, 123 Utah 182, 257 P.2d 367 (1953) (University bonds for dormitory construction; *Spence v. Utah State Agricultural College*, 119 Utah 104, 225 P.2d 18 (1950) (State College bonds for construction).

to obtain it elsewhere. There is a less substantial benefit to mortgage lenders who participate in the Agency's mortgage transactions. These benefits, however, are merely incidental to the dominant purpose of the Act to alleviate a serious statewide shortage of decent low and moderate income housing, with its consequent ill effects. While it is improper to spend public funds for private purposes, such private benefits incidental to a dominant public purpose do not detract from the constitutionality of the legislation.

In *Tribe v. Salt Lake City Corporation*, supra, note 6, it was charged that urban renewal legislation was unconstitutional insofar as the proposed renewal projects would confer benefits upon adjoining private landowners. The Court held that these private benefits were incidental to the public purpose of clearing slums and blight, and thus not dispositive of the question of constitutionality. The legislation was held constitutional.[9]

It is immaterial, of course, whether the incidental private benefits conferred by the legislation are viewed as particularly "personal". What could be more personal than the education provided by public universities, the food and clothing provided by public welfare subsidies, the medical attention underwritten by public medicare programs, all of which have been found constitutionally proper?

The private benefits which may result from the operation of the Housing Finance Agency Act are not different in kind from those described in *Tribe*. They are equally incidental to the main public purpose of the Act, and do not affect its constitutionality. This question has been discussed and decided in favor of similar legislation in many of the sister states previously cited.

Appellants allege that the sale of bonds and notes by the Housing Finance Agency will result in the lending of state credit in favor of the Agency in violation of Article VI, Section 29 of the State Constitution and the creation of state debt in violation of Article XIV, Section 1 of the Utah State Constitution.

Debts and obligations of the Agency are payable solely out of funds of the Agency, ordinarily comprising proceeds from bonds and notes and payments on loans. The Act specifically provides that debts of the Agency cannot become debts of the state, that the credit of the state cannot be loaned in favor of the Agency, and that funds of the state cannot be obligated to pay debts of the Agency. All notes and bonds of the Agency must, by statute, bear a disclaimer to such effect. The Utah law is very plain that such self-liquidating notes and bonds of state agencies are not debts of the state and do not constitute a lending of the state's credit.[10]

An agency which supports itself by the sale of self-liquidating notes and bonds in no way obligates the state to raise or spend tax revenues, and therefore creates no state debt.[11] The Housing Finance Agency Act also provides, however, that the Agency must maintain a capital reserve fund sufficient to cover currently maturing obligations. Should current income be insufficient to meet this requirement, an additional appropriation may be sought from the legislature to cover the deficit, and the legislature may make such an appropriation. In short, the legislature may make future appropriations to defray the obligations of the Agency. It has been charged in a number of the housing finance agency cases from sister states that such provisions constitute a lending of state credit and the creation of state debt because they indicate that recourse may be had to state funds to pay agency obligations where agency funds are insufficient. It does not appear that such provisions have been considered in a Utah case.

**9.** See also *Thomas v. Daughters of the Utah Pioneers*, 114 Utah 108, 197 P.2d 477 (1948).

**10.** *Spence v. Utah State Agricultural College*, supra, note 8; *Tribe v. Salt Lake City Corp.*, supra, note 6; *Allen v. Tooele County*, supra, note 8.

**11.** *Huber v. Groff, et al.*, Mont., 588 P.2d 1124 (1976).

If the legislation requires future appropriations to defray the obligations of the Agency it would be invalid as lending the state's credit, but where, as here, it merely allows future appropriations without requiring such, it creates no binding obligation upon the state and therefore does not result in a debt of the state or the lending of the state's credit.

Other assignments of unconstitutionality of the Act have been considered, but we find them to be without merit. We hold the Act in question to be constitutional and therefore affirm the judgment of the trial court.

· No costs are awarded.

CROCKETT, MAUGHAN, WILKINS and HALL, JJ., concur.