268 P.2d 682

**BARLOW**

v.

**CLEARFIELD CITY CORP. et al.**

No. 8136.

Supreme Court of Utah.

March 26, 1954.

25. Sec. 59–9–9 and 10, U.C.A.1953.
26. Sec. 13–2–17, U.C.A.1953.

27. Sec. 50–1–9, U.C.A.1953.

420

George B. Handy, Ogden, for plaintiff.
Howell, Stine & Olmstead, Ogden, Wm. H. King, Clearfield, for defendant.

WADE, Justice.

Plaintiff, Barlow, a resident and taxpayer of defendant Clearfield, a third-class city in Davis County, Utah, petitions this court for a writ against that city and the defendant Weber Basin Water Conservancy District

enjoining them from performing a contract between them whereby the district undertakes to supply the city a perpetual right to the use of 1,000 acre-feet of culinary water per annum. Plaintiff claims that such contract is void. The writ was issued and the defendants filed their return without raising any issue of fact praying that the writ be recalled and the petition dismissed because it fails to state a claim on which relief can be granted.

On August 29, 1949, Congress authorized the Bureau of Reclamation to construct the Weber Basin Project as outlined in a report by the Regional Director of the Bureau of Reclamation to the Department of Interior dated July 15, 1949. Thereafter the Weber Basin Water Conservancy District, encompassing Weber, Davis and Morgan Counties and most of Summit, was organized under the Utah Water Conservancy Act,[1] to conserve the waters of the Weber River and its tributaries by contracting with the United States for the construction of such project and by selling to consumers the water rights thereby created and by other appropriate actions. On December 6, 1952, an election throughout the district was held to authorize the district to enter into such a contract with the United States for the construction of the project at the overall cost of $70,385,000, of which $57,694,000 would be repaid by the district in annual installments over a 60 year period, and to issue $6,500,000 in bonds to finance the cost

of constructing filtration plants, water lines and other facilities for the treatment and delivery of culinary water to municipalities. The vote was overwhelmingly in favor of both propositions and on December 12, 1952, the district entered into the contract with the United States and since then has been proceeding to provide for the bond issue and to contract for the sale of the water rights to be created under such project.

The project contemplates the appropriation and conservation for culinary, irrigation and other beneficial use of the Weber River system's remaining unappropriated waters. The natural flow of the waters of this system is erratic and fluctuates widely from season to season and year to year, with a large spring run-off and a very greatly reduced flow during the other seasons of the year. Before the turn of the century most of the flow except for the spring floods had been appropriated mostly for the irrigation of crops but because of the reoccurrence of dry years crop failures were not uncommon. To correct this situation storage reservoirs were constructed on the system beginning in 1896 with the East Canyon Reservoir which was enlarged in 1916, and the construction in 1929 of the Echo Reservoir and the Pineview Reservoir in 1936, which with several smaller ones have a combined storage capacity of 150,000 acre-feet. At present an average of only about 60 per cent of the total make of the system is utilized; the other 40 per cent

1. See Utah Code Annotated 1953, Title 73, Chapter 9.

runs to waste into the Great Salt Lake during the spring and winter run-off, often flooding over the river banks and causing great damage.

The Weber Basin area is a highly developed agricultural and industrial section in which the population is increasing rapidly. There are about 33 municipalities requiring additional culinary water supply for their normal growth and development, each of which is proceeding along the same lines as Clearfield to obtain such additional water supply and is interested in the outcome of this action. Nearly all the land under cultivation requires a supplemental water supply and there is much undeveloped land for lack of available water. This is the only available source from which such water can be supplied.

The project contemplates the construction of at least five new reservoirs and the enlargement of two. In all, 418,000 acre-feet of new storage capacity is contemplated with an increase of useful water supply for the area at canal heads of an average of 285,000 acre-feet annually, of which 245,000 acre-feet will be used for irrigation and 40,000 acre-feet for municipal purposes. It is expected to provide full season supply to irrigate 100,400 acres, including 70,400 acres of new lands now unirrigated. The con-

struction of an aqueduct from the mouth of Weber Canyon about eight miles to the north onto the bench lands south of Ogden, and one to the south of the mouth of that canyon for about 23 miles to Bountiful City is contemplated, together with several new gravity canals, pumping plants, infiltration plants for culinary water with transmission lines to the various municipalities and many other features.

As provided by law[2] on October 27, 1953, Clearfield petitioned the district for allotment to it of 1,000 acre-feet of water annually. After it was noticed for hearing, plaintiff filed written objections but the petition was granted by resolution of its Board of Directors on November 27, 1953. This petition and the resolution granting it constitute the contract which plaintiff seeks to nullify. Further details of this contract will be noted in later discussions.

The plaintiff contends that the contract is void because:

1. It requires the city to pay a specified amount annually whether it calls for or uses all or any part of the water allotted to it, and the city thereby loans its credit to the district contrary to Article 6, section 31, of the Constitution of Utah.[3]

2. The terms of the contract are so unreasonable that they are void.

2. See section 73-9-17, U.C.A.1953.

3. Constitution of Utah, Article 6, section 31, provides: "The Legislature shall not authorize the State, or any county, city, town, township, district or other political subdivision of the State to lend its credit or subscribe to stock or bonds in aid of any railroad, telegraph or other private individual or corporate enterprise or undertaking."

3. The contract creates a debt by the city in excess of the taxes for the current year without the approval of a majority of the taxpaying voters of such city, and it creates a debt in excess of 12 per cent of the city's assessed valuation contrary to the provisions of Article 14, sections 3 and 4 of the Constitution of Utah.[4] We will consider these points in the order above stated:

1. This contract does not provide for a loan of the city's credit to the District. The basis of this contention is that this contract is a subterfuge under which the city purports to purchase a water right which it has no use for and thereby loans it credit to the District. Under the contract the city is allotted 1,000 acre-feet per year of water which is presently in the average year more than enought to satisfy its requirements. For this water right the contract requires a total payment of $20,500 annually for the first three years in which water is available for use by the ctiy, of $22,500 annually for the next three years, of $25,500 annually for the next four years, of $31,000 annually for the next thirty years and of $15,000 annually for the next twenty years, making a total of $1,461,000. It further provides that the annual amount specified "shall be paid whether or not all or any part of the water allotted * * * is called for or used by the City"; and that

4. Constitution of Utah, Article 14, section 3, provides: "No debt in excess of the taxes for the current year shall be created by any county or subdivision thereof, or by any school district therein, or by any city, town or village, or any subdivision thereof in this State; unless the proposition to create such debt, shall have been submitted to a vote of such qualified electors as shall have paid a property tax therein, in the year preceding such election, and a majority of those voting thereon shall have voted in favor of incurring such debt."

Constitution of Utah, Article 14, section 4, provides: "When authorized to create indebtedness as provided in section 3 of this Article, no county shall become indebted to an amount, including existing indebtedness exceeding two per centum. No city, town, school district or other municipal corporation, shall become indebted to an amount, including existing indebtedness, exceeding four per centum of the value of the taxable property therein, the value to be ascertained by the last assessment for State and County purposes, previous to the incurring of such indebtedness; except that in incorporated cities the assessment shall be taken from the last assessment for city purposes, provided, that no part of the indebtedness allowed in this section shall be incurred for other than strictly county, city, town or school district purposes; provided further, that any city of the first and second class when authorized as provided in Section three of this article, may be allowed to incur a larger indebtedness, not to exceed four per centum and any city of the third class, or town, not to exceed eight per centum additional, for supplying such city or town with water, artificial lights or sewers, when the works for supplying such water, light and sewers, shall be owned and controlled by the municipality."

in the event of a water shortage "no liability shall accrue against the District, or the United States, or any of their officers, agents or employees" and that "the payment to the District provided for herein shall not be reduced because of such shortage" and that during "periods of water shortage allocations of municipal water shall have first priority." There is no claim that the contract was not made in good faith to supply a genuine need of the city or that the city will not receive and use a substantial portion of the allotted water or that the amount of water allotted and to be paid for is more than a reasonable reserve supply to provide against times of extreme drouth and for the future growth and development of the city. Since the project contemplates the creation of 418,000 acre-feet of new storage capacity with an average annual increase of 285,000 acre-feet of water for use at the canal heads, of which 245,000 acre-feet will be used for irrigation and only 40,000 acre-feet for municipal use which has first priority in times of shortage, the possibility of a shortage of municipal water seems quite remote. Nor can we assume that the city will fail to call for or use any part of this water which it needs, or fail to advantageously dispose of to others, where possible, any surplus which it does not need.

Under statute the city may "acquire, purchase or lease all or any part of any water, waterworks system, water supply or property connected therewith, * * *." [5] It may "construct, purchase or lease and maintain canals, ditches, artesian wells and reservoirs, may appropriate, purchase or lease springs, streams or sources of water supply for the purpose of providing water for irrigation, domestic or other useful purposes; * * *." [6] and "may construct, maintain and operate waterworks, * * * or purchase or lease such works * * * and they may sell and deliver the surplus product or service of any such works, not required by the city or its inhabitants * * *." [7] These statutes clearly authorize the city to acquire by any lawful means sufficient water to satisfy its reasonably anticipated needs in view of probable periods of drouth and the normal future growth and development of the city. It is expressly authorized to sell and deliver to others any surplus product not required by the city or its inhabitants, thus clearly authorizing the city to provide a reserve supply for emergencies and future growth and development. Since there is no indication that the allotment is greater than necessary to supply the reasonably anticipated future needs of the city, or that there is any likelihood that substantially more water will be paid for than used, this is not a case of lending the city's credit, but a bona fide con-

5. See section 10–7–4, U.C.A.1953.
6. See section 10–8–18, U.C.A.1953.

7. See section 10–8–14, U.C.A.1953.

tract to supply the city's culinary water needs.

■ 2. The terms of the contract are not so unreasonable as to make it void. To support his contention plaintiff cites the terms discussed above with some additional ones, to wit: 1. That the city does not need all the water allotted. 2. That the full annual payment is required even though the water is not called for or used or is unavailable. 3. That the price is exorbitant and 4. That the payments are strung out over too long a period. We have already pointed out that the surplus supply is merely a reasonable reserve to provide against drouth periods and for the future growth of the city and that although the full annual payments must be made whether the full 1,000 acre-feet are used or not, it is quite improbable that a substantial portion of that water will not be used. Also the annual installments are not merely a payment for the water allotted for the year the payment is made but all of the installments together constitute the full payment for making the water permanently available, and after the sixty annual installments are paid only small operating and repair costs will continue. Periodic installments of the purchase price of property seldom are reduced on account of the failure of the purchaser to use the article purchased. As to the claim that the price is high and strung out over too long a time, there is no claim that an adequate water supply can be obtained for less money or is other wise obtainable at any price. This is a large project, it looks to the conservation of all of the waters of the Weber River System, it would be impossible for a part of this District to undertake the development of only sufficient water for its use and impractical to require the payment to be made over a substantially shorter period. Water is the life stream of this western country, the territory covered by this district will have its growth stunted without this development and that is particularly true of this city. In view of all these facts the terms of this contract are not unreasonable.

■ 3. The last point raises the question whether the total of the sixty installments is a "debt" or "indebtedness" of Clearfield City as those terms are used in Article 14, sections 3 and 4 of our Constitution.[8] Such total exceeds the taxes for the current year and is more than 12 per cent of the assessed valuation of the taxable property of the city, so such total exceeds any possible debt which the city can incur. The obligation to make such payments is created from the petition of the city approved by the District for a perpetual allotment of 1,000 acre-feet annually of culinary water for the use of the inhabitants of the city, under which "taxes shall be levied annually by the Board of Directors of the District upon the property within the city as provided by section 73–9–17, Utah Code Annotated, 1953, as

8. See note 4.

amended by Chapter 132, Laws of Utah 1953, at a rate sufficient to produce the annual amount specified * * * less any amount paid * * * from water revenues, and from any other source." Thereunder the city will distribute the water and collect revenues for its use. It may out of such revenues and from other sources voluntarily pay all or part of the annual installments but it assumes no obligation and cannot be coerced into making any payment thereon. Under these circumstances does the total of these installments constitute a "debt" or "indebtedness" of the city?

We have decided related problems but never directly decided this question. In Barnes v. Lehi City,[9] we held with most jurisdictions that the terms " 'debt' " and " 'indebtedness' " as used in constitutional debt limitations of municipalities " 'is given a meaning much less broad and comprehensive than it bears in general usage.' " We further said:

> " * * * It has now become a well-recognized principle of law that these constitutional provisions do not apply to a case where public property is purchased or constructed, and payment therefor is to be made, exclusively from the revenues derived from the property.

* * * The credit of the city is not extended, nor is any money which is derived from taxation or other existing sources of revenue expended, in the purchase price or maintenance cost of the plant. The city cannot be coerced into applying any part of its general revenue for the payment of the purchase price of the plant or for any part of the cost of maintenance thereof."

In later cases we have limited this doctrine so as not "to exclude an obligation, * * * where the city cannot escape the obligation and may be compelled to make payment, even though payment be limited to a special fund, where the special fund is made up of revenues from property now owned by the city."[10]

Later, in Conder v. University of Utah,[11] we refused to apply the "restricted special fund theory" without which we said " * * In the event of failure to pay the indebtedness the state would be under no obligation to appropriate money from general taxes to pay it. Such an obligation is not a debt in the contemplation of the constitutional limitations * * *." and further quoted with approval the following: " '* * * If the validity of the special fund doctrine be assumed, the debt affected by constitutional

9. 74 Utah 321, 279 P. 878. The first quotation is quoted with approval at pages 337–338 of 74 Utah, at page 884 of 279 P., from Swanson v. City of Ottumwa, 118 Iowa 161, 170, 91 N.W. 1048, 1051, 59 L.R.A. 620, the second quotation is taken from 74 Utah 340, 341, 279 P. 885.

10. Fjeldsted v. Ogden City, 83 Utah 278, at page 297, 28 P.2d 144, at page 152, and see also Wadsworth v. Santaquin City, 83 Utah 321, 28 P.2d 161.

11. Utah, 257 P.2d 367, at pages 370 and 371.

limitations is an obligation for the payment of which the levy of taxes may be required. It is inconsistent with that assumption to treat as debt an obligation for the payment of which taxation cannot be required.' " [12]

Thus it is clear that whether or not the city can be coerced into levying a tax to pay the obligation either directly or indirectly is held to be a strong factor in determining whether an obligation is a debt of the city. Here it is clear that the city cannot be coerced into levying a tax to meet this obligation although it may pay the whole or a part thereof from the water revenues or other sources. If the city fails to make any part of such payment the balance must be collected through a tax levied by the Board of Directors of the District upon the property within the city. The water was allotted to the city upon its petition, the city will distribute the water delivered under such allotment and collect the revenues for the use thereof. We hold that these facts do not make this a debt of the city.

The levy is made only on property within the city because that area has been selected for a special benefit from the District of having culinary water made available from this project. The fact that the area covered by this special benefit is the same as that covered by the city does not make the tax levied by the District the obligation of the city, nor do the additional facts that the allotment was made on the petition of the City Council and that the water will be distributed by the city which will collect revenue for the use of such water. All of these rights and duties are conferred upon the city as a convenient instrumentality for accomplishing the purposes of the District. The city and the District are two separate and distinct entities organized generally for separate and distinct purposes but whose purposes converge and cover some of the same objectives. Sometimes the purposes of one dovetail and coordinate with those of the other. The city is a convenient instrumentality for doing these things which are necessary to be done in order to accomplish the objectives of the District and the area of the city is an appropriate part of the district to receive special benefits from the district which provides the special benefits and levies and collects the taxes to pay for such benefits. Thus it is an obligation of the district. The functions which the city performs and the rights which it acquires are merely incidental in assisting the district to accomplish its purposes. The city may collect all or a part of the required payments from the water revenues and other sources and pay them to the district, but it is not obligated and cannot be coreced into paying anything thereon. So we hold that this is an obligation of the district and not a debt of the city.

The legislature enacted the Water Conservancy Act[13] under which the district was

12. "Municipal Improvements as Affected by Constitutional Debt Limitations" 37 Columbia Law Review, pages 192 to 197.

13. See note 1 and section 73–9–1, U.C.A. 1953.

created for the purpose of conserving all the water resources of the state and putting them to a beneficial use. At this stage of the state's development, when all the water which can be diverted and used with little expense has long been appropriated, the expenditure of large sums will be required to accomplish such purposes. Although the new lands which will be brought under cultivation and irrigation eventually will be very valuable, they presently have little or no value. With this in mind the legislature in authorizing the creation of Water Conservancy Districts intended to make them free from debt limitations, and to require them to assume the debts which must be incurred in accomplishing their purposes. The legislature intentionally placed on the District the power and duty to levy taxes on the property of the district and different subdivisions thereof to pay the costs of the projects which it undertakes,. rather than to place such powers and duties on the various cities, towns and other govermental subdivisions which have debt limitations. Without this the districts would be greatly hampered and in many instances would be unable to accomplish their purposes. The conservation of the water resources of this state is of vital importance to the growth and development of the state and have the potentiality of increasing its wealth. Since there is no constitutional provision which prevents the legislature from creating this kind of a corporate entity and making the obligations incurred in accomplishing such purposes its debts[14] this statute is not unconstitutional.

The permanent writ is denied, the alternative writ recalled and the petition dismissed. Each party shall bear its own costs.

McDONOUGH and CROCKETT, JJ., and WM. STANLEY DUNFORD, District Judge, concur.

HENRIOD, Justice (dissenting).

Concededly the result permitted by the main opinion is a desirable one, but I respectfully dissent as to the route and reason of arrival. There is no argument against the contention that water is our economic life blood, and its conservation and use are vital. But of equal importance is the requirement that in accomplishing our desired result, we should adhere to constitutional fundamentals and refuse to condone any artifice or subterfuge designed to circumvent constitutional provisions relating to debt limits of local governmental units. It seems to me that in the instant case, we indulge in a method of arriving at a desired result by ignoring the Constitution, essaying the history and geology of the projects and concluding that it is constitutional because it is a fine and desired thing. Apparently we assume that should we decide contra, the

14.  See Lehi City v. Meiling, 87 Utah 237, 48 P.2d 530; Patterick v. Carbon Water Conservancy District, 106 Utah 55, 145 P.2d 503; Tygesen v. Magna Water Co., Utah, 226 P.2d 127.

water involved forever would be lost to those desiring to conserve and use it. Not so. Everything proposed could be accomplished through a private or even public corporation, with subscribing stockholders and users.

No matter how you slice it, this case in the last analysis does this: It permits a local government unit, without a vote of the inhabitants, to apply for and receive an annual 1,000 acre feet of water for use by the inhabitants, who, without a vote, are bound to pay for it. It allows the local unit to permit a legislative creature, the conservancy board, to promise to pay for the project and hence the water it produces, and allows the local unit to sit by and take advantage of the board's promise to pay, without creating any technical debt on the part of the city. It then permits the 3rd party statutory creature rather than the local unit, to tax the inhabitants of the local unit far beyond the debt limit of the unit in any amount necessary to guarantee and satisfy the promise of the board. In other words, the conservancy board has, as a practical matter, actually promised nothing, but by a strange statute, the inhabitants of the city or town, without having a chance to vote on the matter, are made guarantors of the board's paper promise, to the extent that their property might be levied upon and sold to insure that such promise (which now you do and now you don't see) be kept. Everyone agrees that this could not be done directly by the city because of the constitutional debt limit. The main opinion, however, says such circuity of technique satisfies constitutional requirements. I would say the Constitution has not been *satisfied,* it has been circumvented, emasculated, and ignored.

After this decision, what is to prevent the legislature from eliminating constitutional debt limitations altogether by creating a dummy board, authorized to promise anything under any kind of a proposed project, and with power to back up that promise with an absolute power to tax local citizens, perhaps against their will, without their consent and without any opportunity to voice their choice by suffrage? The answer is that there is nothing to prevent it, and we may as well tear out the pages of the Constitution relating to debt limitations on local governmental units. It would seem to the writer that the main opinion gives to the legislative branch of government an absolute power to delete, amend, modify, recognize or ignore the Constitution as hereafter it may choose.

WOLFE, C. J., being disqualified, does not participate herein.