# IN THE MATTER OF THE MASTER CONTRACT BETWEEN THE OAHE CONSERVANCY SUBDISTRICT AND THE UNITED STATES

(185 N.W.2d 682)

(File No. 10876. Opinion filed March 29, 1971)

446

**Gordon Mydland,** Atty. Gen., **R. James Zieser, William J. Srstka, Jr.,** Asst. Attys. Gen., Pierre, for Oahe Conservancy Subdistrict.

BIEGELMEIER, Judge.

The South Dakota Conservancy District, created by Ch. 453, § 5, S.L.1959 (now SDCL 46-17-4)[1] whose boundaries are the boundaries of the State of South Dakota, is declared to be a governmental agency, body politic and corporate with authority to exercise the powers specified therein. Chapter 46-18 provides the method of establishing subdistricts. Oahe

---

1. Except where proceedings took place under Session Laws in effect when the District was organized, for convenience, citations will generally be to SDCL 1967, now the official code cited only as SDCL. See Ch. 17, S.L. 1970.

Conservancy Subdistrict claims to be duly established and organized thereunder. Chapters 46-17 and 46-18 of SDCL contain provisions outlining the powers and mode of operation of both districts. Proceedings were taken to establish the Oahe Subdistrict[2] by an election approving it as well as directors thereof, and to carry out the district's powers including the execution of a Master Contract with the United States of America.

Chapter 223, § 9, S.L.1964 (now SDCL 46-18-39) provided:

> "Contract Judicially examined. The Sub-District board of directors, after entering into a contract with the United States, shall commence a special proceeding for a judicial examination of such contract by filing a copy of such contract with the judge of a circuit court of any county within the Sub-District with a petition asking for such judicial examination. Such judge shall give notice of hearing on such contract and petition by publishing a notice in an official newspaper in each county in the Sub-District. Such notice shall make reference to such contract and petition and shall state where the same is filed and may be examined by any interested party. The notice of hearing shall be published once each week for two successive weeks and shall fix the time and place of the hearing which shall be not less than ten nor more than twenty days from the last date of publication. Such proceedings shall comply as nearly as possible with the procedures required in the case of irrigation districts under the laws of South Dakota."

Pursuant to the foregoing authority, in 1969 the board of directors of the Oahe Conservancy Subdistrict commenced a special proceeding in the Circuit Court of the Sixth Judicial

---

z. Chapter 459, S.L. 1961 legalized, cured and validated all acts, rules, regulations and procedures in the creation of the Oahe Subdistrict and confirmed its creation.

Circuit and prayed that the proceedings had and the actions taken for the organization of the Oahe Conservancy Subdistrict and for the making of a Master Contract between the United States and said Subdistrict and for said Subdistrict's levy of a tax sufficient to meet its obligations under said Master Contract be examined, approved and confirmed by the circuit court. After notice, the circuit court conducted a hearing on November 23, 1969, and examined into the proceedings had, the actions taken for the organization of the Oahe Conservancy Subdistrict, for the making of a Master Contract between the United States and said Subdistrict, and for said Subdistrict's levy of a tax sufficient to meet the obligations under said Master Contract. After the hearing, the circuit court entered findings of fact, conclusions of law and an order approving and validating the proceedings.

It is stated the Master Contract involves the construction and use of public works comprehending the initial stages of the Oahe Unit of about 190,000 acres of the Missouri River Basin Project as authorized by the Act of August 3, 1968 (P.L. 90-453, 82 Stat. 624); that expenditures for such public works were authorized by Congress in the sum of $191,670,000 based on 1964 cost indices and the works will exceed 100 million dollars in cost.

Thereafter by Ch. 253, S.L.1970, effective July 1, 1970 and now SDCL 46-18-39.1 of the 1970 Pocket Supp., the following was added to SDCL 46-18-39:

"46-18-39.1. **Certification to Supreme Court of questions involved in large project—Decision by Supreme Court.**—Where a contract examined under § 46-18-39 involves the construction and use of public works which will exceed one hundred million dollars in cost, the judge of the circuit court may, upon motion of the Governor, or of any of the parties, and provided such motion shall be made within one year after the entry of judgment, or other order making final determination of the proceeding, certify to the Supreme Court for determination questions bearing on the validity or constitu-

tionality of the actions taken as a preliminary to and in connection with the execution of such contract and the levy of assessments therein required. Upon the determination of questions so certified, the circuit court shall affirm or modify its judgment or other final order and enter findings of fact and conclusions of law in accordance with such determinations."

Within one year after entry of the order of November 25, 1969 by the circuit court, the Governor of the State of South Dakota and petitioners herein filed their motion that the circuit court certify to the Supreme Court certain questions bearing on the validity or constitutionality of the actions taken as a preliminary to and in connection with the execution of the said Master Contract. Thereupon, one of the judges of the circuit court submitted six certified questions relating thereto to this court for answering and determination. Petitioners urge that the circuit judge's conclusions be affirmed.

## I.

After the questions were certified to this court accompanied by a brief of the Attorney General supporting affirmative answers to the questions certified and the validating order of the circuit court, this court of its own motion requested the Attorney General to submit a brief on the constitutional propriety of this court to consider and determine the questions in the manner presented.

Initially, by our constitution, the Governor has the authority to require opinions of the judges of the Supreme Court upon important questions of law involved in the exercise of his executive powers and upon solemn occasions. Art. V, § 13, S.D. Constitution. We do not believe this section applies nor did movants so intend. The motion of the Governor and the Subdistrict is not directed to the judges of the court, as such, but is to the Supreme Court pursuant to SDCL 46-18-39.1, supra.

Art. V, § 2, of our constitution declares:

"The Supreme Court, except as otherwise provided in this Constitution, shall have appellate jurisdiction only, which shall be coextensive with the state, and shall have a general superintending control over all inferior courts under such regulations and limitations as may be prescribed by law."

Article V, § 2 of the Wyoming Constitution and Article IV, § 86 of the North Dakota Constitution are substantially of the same wording. The legislatures of both states have provided for the submission of certified questions by lower courts to their Supreme Courts. Sections 1-191 through 1-193, Wyoming Statutes 1957, and Chapter 32-24, North Dakota Century Code. While the Wyoming statutes limit the question that may be reserved and sent to the Supreme Court for its decision as an important and difficult constitutional question and the North Dakota statutes permit the certifying of a question in the sound discretion of the trial judge with other limits, the propriety of such legislation is much the same under our constitution as under theirs.

The Wyoming act was challenged in State v. Crocker, 5 Wyo. 385, 40 P. 681, where the state contended the act attempted to grant original jurisdiction to the Supreme Court which the constitution did not allow. The court answered this by saying it could not adopt the view that this class of cases involved the original jurisdiction of the court. Defendant's counsel insisted the proceedings were within the appellate jurisdiction of the court, as well as authorized by the provision of the constitution giving the Supreme Court superintending control over all inferior courts. The court wrote:

"* * * we are unable to avoid the conclusion that such cases come within the appellate jurisdiction of this court. Beyond that, however, the constitution grants to the supreme court a superintending control over all inferior courts under such rules and regulations as may be prescribed by law. Why may not the legislature, under this clause, well authorize such superintending control to be exercised in important and difficult matters in the manner pro-

vided for by the statute of 1888? It seems to us that there is neither impropriety nor invalidity in so doing."

The North Dakota Supreme Court in City of Grand Forks v. Grand Forks County, 1965, N.D., 139 N.W.2d 242, answered several questions certified to it under Ch. 32-24, N.D. Century Code and declined to answer others for the reason the opinion on those would be advisory only. In doing so it reviewed and cited decisions which defined the requisites of its appellate jurisdiction upon which it based its conclusion that it had authority to consider the certified questions. In In re Garrison Diversion Conservancy District, 1966, N.D., 144 N. W.2d 82, the court exercised this jurisdiction in considering certified questions involving the confirmation of a Master Contract between the United States and a conservancy district of that state similar to the circumstances here. Other courts have determined questions involving similar districts under various legal situations.

In Bridal v. Cottonwood Creek Conservancy Dist. No. 11, 1965, Okl. 405 P.2d 17, the court considered an appeal in a proceeding in the district court where that court entered orders creating the Conservancy District and approving a Works Plan; an original quo warranto proceeding in the Colorado Supreme Court was the method that court permitted to challenge that state's Water Conservancy Act which it held valid and constitutional, People ex rel. Rogers v. Letford, 102 Colo. 284, 79 P.2d 274, and the Supreme Court of Utah also took original jurisdiction of a suit to enjoin a city and water conservation district from performing a contract under its Act. Barlow v. Clearfield City Corp., 1 Utah 2d 419, 268 P.2d 682. Our court in Mettet v. City of Yankton, 71 S.D. 435, 25 N.W.2d 460, and Robbins v. Rapid City, 71 S.D. 171, 23 N.W.2d 144, granted permission to commence original actions in the Supreme Court to enjoin defendant cities from purchasing a bridge in Mettet and from carrying out a contract to purchase water from the United States in Robbins. These actions involved only cities but are indicative of an attitude to expedite determination of questions of public interest. The present proceeding is of area-wide, if not state-

wide, interest and importance and is persuasive of our conclusion to accept jurisdiction here, though had an action for injunction been commenced, we would not have been required to dwell on the jurisdiction question. Finally, in Nebraska Mid-State Reclamation Dist. v. Hall County, 152 Neb. 410 N.W.2d 397, the court stated its Act "authorizes reclamation districts to prosecute a special confirmatory proceeding in the nature of an action in rem in the district court" and referred to earlier opinions which described the proceeding in the same terms as did cited Supreme Court opinions of California, Idaho and Washington. An appeal from the district court's decree holding the Act constitutional, holding taxes levied were valid and granting other relief was affirmed.

This in rem phase deserves mention. While public officers were on both sides of the case the Nebraska published summons named "all persons having or claiming any interest" in the District, much the same as our quiet title actions. SDCL 21-41-6. Our probate proceedings do not name parties to an action and are commenced by a notice signed by a judge. SDCL 30-6-8. Both of our proceedings are in rem and jurisdiction is acquired, in part in some proceedings or in whole by publication in a newspaper. SDCL 21-41-9 and 30-6-9. Notice of hearing this special proceeding of the Subdistrict was given by publication. SDCL 46-14-33.

The Wyoming court indicated the statute brought the matter before it either as a case within its appellate jurisdiction or its superintending power. Article V, § 18 of our constitution provides appeals "may be allowed from the decisions of the circuit courts to the Supreme Court under such regulations as may be prescribed by law." The legislature has made provisions for such appeals. SDCL 15. Had the circuit court denied relief prayed for by the Subdistrict, could it not have appealed to this court under SDCL 15-26? And, if so, may not the legislature authorize the court either to exercise its superintending power under Art. V, § 2 of our constitution or grant the Governor power to act and, in effect, appeal to this court from the decision of the trial court on behalf of the public as well as prescribe the method by which it be presented, such as by certified questions pertinent to the

proceeding and important to the public generally? We think so. Other states have varying laws or procedures to the same end.[3]

 It is unnecessary to determine (nor did the Wyoming court in State v. Crocker, supra,) whether jurisdiction was conferred under the appeal or superintending powers of the constitution. Nor is there need to determine whether the court may exercise its discretion in answering certified questions, in whole or in part, nor all of the limitations to be applied to this procedure. Cf. SDCL 15-26-18. When the question is one of great public interest and it affects substantial property or constitutional rights of public corporations and many citizens, as it does here, the court should exercise its discretion in favor of answering the questions as may be herein limited. Necessity of court confirmation was presented to the North Dakota Supreme Court. See 144 N.W.2d at 85. Article 36 of the Master Contract sets this at rest as it provides the contract shall not be binding on the United States until the organization, proceeding and contract shall have been confirmed by a court of competent jurisdiction or pending appellate action.

Being of the opinion the court has jurisdiction to determine the validity of the orders and decision of the circuit court as authorized by SDCL 46-18-39.1 under either of the constitutional provisions noted, we next consider the questions certified.

## II.

### A.

History and nature have taught man the importance and necessity of the availability of water for domestic and agricultural purposes. The need ranges from an aid to economic development to his very survival. Legislatures of what have

---

3. See generally 21 C.J.S. Courts § 311 et seq. Rhode Island's Supreme Court considered certified questions in Probate Court of East Providence v. McCormick, 1936, 56 R.I. 308, 185 A. 592, under a statute of similar import, Ch. 348, § 5, General Laws 1932, now § 9-24-27, Gen. Laws, R.I., 1956.

been termed the "arid" western states,[4] by their declarations and the passage of their many acts, have recognized the dependance and value of an ample supply of water and its conservation for the public welfare. Our laws have long reflected this concern. Conservation of the state's water resources has been declared a state function and public interest and necessity require creation of water conservancy districts. SDCL 46-16-1. Passage of Ch. 453, S.L.1959, was undoubtedly brought about by the building under the Pick-Sloan plan (P.L. 534, 58 Stat. 887) of four large dams on the Missouri River by the U.S. Corps of Engineers at Gavins Point, Ft. Randall, Big Bend and Oahe in this state. It resulted in the creation of four reservoirs or lakes of from 25 to 200 miles in length stretching across the state from north to south and impounding of over 32 million acre feet of water available for flood control, recreation, irrigation, navigation, generation of electric power, domestic and other uses.

Construction of dams by the federal government in Colorado, Utah, North Dakota and other states resulted in large water storage facilities and was the motivation for those states passing legislation creating conservation districts to make the water available for irrigation and other public uses. See People ex rel. Rogers v. Letford, 102 Colo. 284, 79 P.2d 274, and Barlow v. Clearfield City Corp., 1 Utah 2d 419, 268 P.2d 682.

With this background, the six certified questions are now set out:

"1. Is SDCL 1967, Ch. 46-18, valid under the provisions of Article III, Section 1 of the South Dakota Constitution, particularly as to powers delegated to and vested in the board of directors of a conservancy sub-district ?

4. See Clark, 4 Waters and Water Rights, p. 418. "Water is the life stream of this western country", Wade, J., Barlow v. Clearfield City Corp., 1 Utah 2d 419, 268 P.2d 682. See also Knight v. Grimes, 80 S.D. 517, 523, 127 N.W.2d 708, 711, and 20 Drake L.Rev. 256.

"2. Under SDCL 1967, Ch. 46-18, are procedures to be followed by the board of directors of a conservancy sub-district in making a contract with the United States of America consistent with the due process provisions of Article VI, Section 2 of the South Dakota Constitution?

"3. Is it consistent with the due process provisions of Article VI, Section 2 of the South Dakota Constitution for a board of directors of a conservancy sub-district to enter into a contract with the United States of America pursuant to general contracting authority approved by the electors of the conservancy sub-district under SDCL 1967, 46-18-34 to 46-18-38, when such conservancy sub-district was organized at a time when each specific contract with the United States needed to be approved by the electors of the conservancy sub-district under the provisions of SDC 1960 Supp. 61.1424?

"4. If the provisions of SDCL 1967, Ch. 46-18 are constitutionally valid, were all acts and proceedings of the Oahe Conservancy Sub-District or of its Board of Directors, or both, leading up to the authorization and execution of the Master Contract between the said Sub-District and the United States of America, legalized, ratified, confirmed and validated by SL 1969, Ch. 282, so that said Master Contract is a valid and legal obligation of said Sub-District?

"5. Are the provisions of SDCL 1967, Ch. 46-18, for the levy, assessment and collection of taxes by a conservancy sub-district valid delegations of legislative power?

"6. Are the procedures proposed by the Board of Directors of the Oahe Conservancy Sub-District for the levy, assessment and collection of taxes pursuant to its said Master Contract with the United States, consistent with the legislative requirements of SDCL 1967, Ch. 46-18 and with the uniformity

provisions of Article XI, Section 10 of the South Dakota Constitution?"

We believe the reasoning of the opinion will determine the answers to the questions raised.

Under the original Ch. 453, S.L.1959, under which the Oahe Subdistrict claims to be formed, 25% of the owners of real estate in an area could petition the District Board proposing the organization of a subdistrict and, if approved by the District Board, the question is submitted at the next general election to all electors in the area covered; municipalities and other named areas constitute separate election districts; no election district may become a part of a subdistrict unless 60% or more of the votes cast are in favor of it. Any election district may withdraw therefrom within 60 days by filing a petition requesting withdrawal signed by 25% of the landowners in that election district upon which another election is held. The District Board may by resolution create the subdistrict of the election districts voting in favor thereof. Boundaries may be adjusted or the subdistrict dissolved by 60% of the vote cast at a later election. Provision is made for election of a Subdistrict Board of Directors. This Board is given authority to levy a tax not to exceed 1/10 mill for organization and administrative expenses.[5]

The circuit court found the Oahe Subdistrict was organized under the cited Ch. 453; that all steps prescribed therein were duly taken, including the filing of a landowner's petition, the holding of an election on November 8, 1960 and a vote of 50,503 to 8,712 favoring establishment of the subdistrict;[6] that the South Dakota Conservancy District Board by resolution established the Oahe Conservancy Subdistrict, which was filed with the Secretary of State December 27, 1960, whereby it became a political subdivision of the

---

5. SDCL 46-18-31 and 46-18-32. An outline of the act as it existed in 1961 and some comments appear in a note in 7 S.D. L.Rev. 157.
6. The court in Wilson v. Board of Trustees of Sanitary District, 133 Ill. 443, 461, 477, 27 N.E. 203, 205, 210, mentioned the election which approved formation of a sanitary district.

state with all the powers provided in Ch. 453; that under a curative act, Ch. 282, S.L. 1969, the Subdistrict was validly and legally created and directors thereof were duly elected and acting.

Article III, § 1, of our constitution vests legislative power in the legislature. The extent of that power has many times been stated by the court, most recently during this term in In re Heartland Consumers Power District, 85 S.D. 205, 180 N.W.2d 398. That the legislature may create, or authorize the creation of, public power districts was there upheld, and what was said in that opinion with reference to the police power of the state to create such public corporations or agencies applies with equal force to agencies created for the conservation, distribution and use of water for the public use and benefit.

This power does not owe its foundation to the authority given the legislature in Art. XXI, § 7 of our constitution which is limited to irrigation of agricultural lands, but to the broader police power. Article 9, § 9 of the Illinois Constitution of 1870, S.H.A., was substantially the same as our Art. XI, § 10. In Wilson v. Board of Trustees of Sanitary District, 1890, 133 Ill. 443, 27 N.E. 203 (quoted by the court in Egan Con. Sch. Dist., Number 1, Moody County v. Minnehaha Co., 65 S.D. 32, 36 270 N.W. 527, 529, 108 A.L.R. 572), the court, in an extensive opinion, held the general assembly had the power to authorize the formation of drainage districts which overlapped and disregarded the existence and boundaries of pre-existing municipal corporations and to invest their corporate authorities with power of general taxation for sanitary purposes. The court further held the power specifically given the assembly in Art. 4, § 31 of the Illinois Constitution to authorize creation of drainage districts and pay for them "by special assessment" (which clause appears in our Art. XXI, § 6, as to drainage, and our Art. XXI, § 7, as to irrigation) was not a denial of the power of the assembly to pay for their operation otherwise than by such assessments nor did it preclude general taxation to support its activities. The reasoning of the opinion on these questions is sound and we

again approve it. Further, the acts under consideration are not limited to irrigation alone.[7]

Part of the original Act now before us declared that the protection and preservation of the benefits from water resources, the protection of the public health and the promotion of the prosperity and general welfare of the people of our state concern a public purpose and required that the South Dakota Conservancy District be created

(1) to provide for the future economic welfare and prosperity of the people, and

(2) the irrigation of lands;

(3) to replenish and restore depleted waters of lakes, rivers and underground waters, and

(4) to reserve all waters in the state and particularly waters impounded in the Missouri River within our boundaries, etc. SDCL 46-17-1.

While this declaration of public use is not in as great detail as those stated by the Colorado or Utah Water Conservancy Acts, it does so more in detail than the Nebraska Reclamation Act and similar to the act creating the North Dakota Garrison Diversion Conservancy District.[8] It covers the subject in broad enough terms to include the preserva-

7. The whole of Title 46 in SDCL covers the subject of "Waters and Water Rights". One of the early irrigation district acts was the Wright Act, Ch. 34, Cal.Stats. 1887, which was the basis of water legislation in 17 western states, listed in Clark, note 4, § 345.1 where the history and subject is discussed. As Ch. 453, S.L. 1959, now SDCL 46-17 and 46-18, is another act which includes "irrigation of lands" (§ 46-17-1), it is treated as being such in part. The scope of the act is more inclusive. SDCL 46-17-1. The Master Contract includes a municipality as an entity which may enter into a water supply contract with the Subdistrict for domestic and other uses.

8. The statutes appear in People ex rel. Rogers v. Letford, 102 Colo. 284, 79 P.2d 274; Patterick v. Carbon Water Conservancy Dist., 106 Utah 55, 145 P.2d 503; Nebraska Mid-State Reclamation Dist. v. Hall County, 152 Neb. 410, 41 N.W.2d 397; In re Garrison Diversion Conservancy District, N.D. 144 N.W.2d 82, and general comment 4 Clark, Waters and Water Rights, § 346 et seq.

tion and use of the water resources for irrigation, municipal, domestic and all public purposes.

 By SDCL 46-17-4 the legislature created the South Dakota Conservancy District including the whole state. This it had power to do by its own fiat. See Nebraska and Utah authorities, note 8. The court in Miles v. Benton Township, 11 S.D. 450, 78 N.W. 1004, confronted with the question of whether a township could, under the constitution, be clothed with the power to construct wells and maintain a system of waterworks for irrigation and domestic use at the expense of the taxpayers, held no constitutional provision precluded the legislature from enacting the statute granting that authority. It wrote:

> "It would startle the profession and general public to suggest that an incorporated city in this state cannot be authorized to construct waterworks * * * It would be difficult to imagine any method of expending its revenues for a more strictly public purpose."

Having authority to create a district by its own fiat, it could, as it did, provide that based on a petition that an election be held to determine whether a subdistrict should be created and that the election bind the residents of the area. This does not deprive any person of due process of law. That method has been the procedure for the incorporation of municipalities in this state since early times, SDCL 9-3, and though they have the power to levy taxes generally, their organization or power has not, nor cannot, within statutory and constitutional limits, be challenged. Conservancy districts are organized for a public purpose and are state agencies and public corporations. The Subdistrict, except for limitations of area and power as defined by statute, necessarily partakes of the same governmental agency and body politic characteristics as its parent body and the District created in SDCL 46-17-4. It is not a true municipal corporation, but is vested with some of the powers and attributes of a municipality, hence is sometimes called quasi-municipal. People ex rel. Rogers v. Letford, note 8. This court has considered the term municipal corporations in several cases and, while the opinions do not determine the questions at bar, we mention

them. In Town of Dell Rapids v. Irving, 7 S.D. 310, 64 N.W. 149, the court held a township (there called a town) was not a municipal corporation within that term as used in Art. XVII, § 18, stating it applied to incorporated cities, etc. with the power of local legislation and quoted a text which defined quasi-corporations as counties, towns and school districts. The court said Art. X seemed to be limited to municipal corporations proper, such as cities or incorporated villages which are agencies to regulate and administer the internal concerns of a locality not common to the state or people at large. Miles v. Benton Township, 11 S.D. 450, 78 N.W. 1004, expresses the same doubt that Art. X applied to civil townships. Egan Con. Sch. Dist., Number 1, Moody County v. Minnehaha Co., 65 S.D. 32, 270 N.W. 527, held a school district was a municipal corporation as that term is used in Art. XI, § 5. The court said that while in its restrictive sense a school district was not a municipal corporation but of a class termed quasi-corporations, the term may be used in a broad generic sense so as to include quasi-corporations and was so used in Art. XI, § 5. We conclude Ch. 453, S.L. 1959, insofar as it authorized the creation of conservancy subdistricts, was a valid exercise of the legislative power.[9]

▇▇▇ It appears from the trial court's findings that proceedings taken under the chapter resulted in the creation of the Subdistrict on December 27, 1960. Chapter 282, S.L. 1969, effective July 1, 1969, declared all conservancy subdistricts purporting to be established thereunder at least one year, to be valid and legally created and the regularity and validity of the creation not open to question in any court. The power to pass curative statutes is without any limit except such as is imposed by constitutional restriction or limitations as applies to school districts. School, power and conservancy districts are all agencies of the state; their organizations and boundaries, as well as their powers, are wholly within the legislative discretion unless limited by the constitution. Cleveland Common School District v. Hosmer In-

9. Opinions cited note 8; Barlow v. Clearfield City Corp., 1 Utah 2d 419, 268 P.2d 682; Bridal v. Cottonwood Creek Conservancy Dist. No. 11, Okla., 405 P.2d 17.

dependent School District, 80 S.D. 275, 122 N.W.2d 545. A similar curative act applied to an irrigation district was held constitutional in State ex rel. Malott v. Board of County Com'rs, 86 Mont. 595, 285 P. 932, and Judith Basin Land Co. v. Fergus County, Mont., 9 Cir., 50 F.2d 792. Having power to create a subdistrict by its own fiat, Ch. 282, S.L.1969 cured any defect in its organization and validated its creation.

## B.

Chapter 453, § 22, S.L. 1959, thereafter SDC 1960 Supp. 61.1422, granted various powers to the board of directors of a subdistrict. It was amended by Ch. 223, S.L.1964, and, among other powers, authorized the board to enter contracts with the United States or any department or agency for the supply of water, the construction, operation or maintenance of water resources projects, etc. SDCL 46-18-23 through 46-18-30. The provisions for obtaining this authority were in Ch. 453, § 24, S.L. 1959, thereafter as SDC 1960 Supp. 61.1424; it was amended by Ch. 261, S.L.1966 and is now SDCL 46-18-34 through 46-18-38.

The trial court in detail found the Subdistrict board gave notice of public hearings to be held in the several counties on whether it should be given contracting authority and otherwise complied with the sections last cited including the submission of the question to the electors of the Subdistrict at the November 8, 1966 general election which approved the authority requested to execute contracts for the payment of all costs incurred in water resource development projects and the Master Contract, and to levy a tax within the limitations of SDCL 46-18 by a vote of more than three to one; that under Ch. 343, S.L. 1967, a curative act, all acts, rules, regulations and procedures which authorized contract authority to the Oahe Subdistrict were declared valid and legal notwithstanding any defect, irregularity or unauthorized actions in such proceedings as the election or petition and the authorization of contract authority was therein confirmed (as does appear in that chapter); that pursuant to such authorizations and following the reauthorization of the Oahe Unit by the act of August 3, 1968 (P.L. 90-453, 82 Stat. 624) the Board of Directors and Oahe Subdistrict consummated contract negotia-

tions with representatives of the United States and, after approval of the South Dakota Conservancy Board, joined with the Assistant Secretary of the Interior on January 8, 1969, in executing a Master Contract between the United States and the Oahe Conservancy Subdistrict in accordance with SDCL 46-18; that under Ch. 282, S.L.1969 (SDCL 1970 pocket supp. 46-18-9.1), the curative act effective July 1, 1969, legalized and declared valid this Master Contract as a valid obligation of the Oahe Subdistrict.

■ From the conclusion reached that the legislature could create the District and from the authorities heretofore cited, we conclude that it could lawfully delegate to the District and Oahe Subdistrict the powers stated in SDCL 46-18-34 through 46-18-38. If it were otherwise it would be an empty power and the state could not complete or carry into action the power it had. The North Dakota act is much the same as ours and the court, in the Garrison opinion, on reasoning with which we agree, concluded there was no unlawful delegation of powers, nor did the execution of the powers by the Subdistrict in the Master Contract violate its constitutional due process clause.

## C.

■ As heretofore indicated some change was made in the original 1959 act under which the Subdistrict was organized as to the manner in which the board could contract. The original act (§ 24) required authority to enter into "a contract", referred to a "proposed contract" and required a 60% favorable vote at a later election thereon, while the amended statute, under which the Subdistrict Board proceeded, made several changes including a reference to seeking "contracting authority" from the District Board to enter contracts and a favorable vote of only a majority of the votes cast at the election. Statutes under which a Subdistrict. is organized do not constitute such a contract between the state on the one hand and the incorporators of a subdistrict and landowners on the other that they cannot be changed by later legislation. It is within the police power of the state and subject to the legislative will. Mizer v. Kansas Bostwick Irr. Dist. No. 2, 172 Kan. 157, 239 P.2d 370, app. dism., 343 U.S. 954, 72 S.Ct. 1053, 96

L.Ed. 1355; La Mesa, Lemon Grove & Spring Valley Irr. Dist. v. Halley, 197 Cal. 50, 239 P.719.

██ The changes in the statute here were of a procedural nature and well within the legislative power to modify. In Mizer the court upheld a change from a statute which originally required that assessments be levied only after an election to an approval thereof by the district court after notice and a hearing. We conclude the changes in the amendment were a valid exercise of the police power and not a violation of either the due process clause of our constitution, Art. VI, § 2 or § 12 prohibiting the impairment of the obligation of a contract.

### D.

Further questions are directed as to whether provisions for the levy, assessment and collection of taxes by the Subdistrict pursuant to SDCL 46-18 and the Master Contract are valid delegations of legislative power and consistent with the uniformity provisions of Art. XI, § 10, South Dakota Constitution.

██ Creation of the Subdistrict, with the powers given to the board to enter the Master Contract, not being unlawful delegations of legislative power neither is the authority of the Subdistrict to levy taxes not in excess of one mill provided for in SDCL 46-18-41 an unlawful delegation of that power.

The brief of the Attorney General in support of the power to tax relies on the second sentence of Art. XI, § 10 of our constitution. For clarity the whole of § 10 is set out.

> "The Legislature may vest the corporate authority of cities, towns and villages, with power to make local improvements by special taxation of contiguous property or otherwise. For all corporate purposes, all municipal corporations may be vested with authority to assess and collect taxes; but such tax shall be uniform in respect to persons and property within the jurisdiction of the body levying the same."

■ We have heretofore adverted to the opinion in Wilson v. Board of Trustees of Sanitary District, 133 Ill. 443, 27 N.E. 203, where, with a similar constitutional provision, the court upheld the authority of the Illinois General Assembly to create sanitary districts which overlapped pre-existing municipal corporations with power of general taxation. First, assuming the Subdistrict is a municipal corporation within that term as used in Art. XI, § 10, the authority to tax, subject to the uniformity clause, is therein given. Second, if the Subdistrict is not within that term, we find nothing in the constitution which limits the legislature from conferring tax powers to it. If uniformity of tax in § 10 does not apply, the same protection is found in Art. VI, § 17 which declares all taxation shall be equal and uniform.

The Colorado court in Letford apparently vested the authority to tax on the first reason and the North Dakota court on the second. In Barlow v. Clearfield City Corp., note 9, the power of the legislature to authorize a water conservancy district to levy a general tax on property within the city to pay the annual installments due was not questioned. "The legislature intentionally placed on the District the power * * * to levy taxes * * * to pay the costs * * * rather than * * * on the various cities * * * which have debt limitations."

E.

■ We have examined other provisions of our constitution to determine if they apply to or affect the opinion and have concluded Art. III, § 26, which denies the legislature power to delegate to a "special commission, private corporation or association" the authority there stated does not bar such delegation to the Subdistrict which partakes of the same nature as the District which is declared to be a "governmental agency, body politic and corporate". SDCL 46-17-4. Nor does Art. XVII, § 1, which directs "No corporation shall be created" (by special act) under the title "corporations", have any application. It is apparent the 20 sections apply to private corporations, except § 18 which expressly names "Municipal and other corporations" invested with the power of eminent domain.

■■■ Does either Art. XIII, § 2, which provides the state may contract debts never to exceed $100,000, or Art. XIII, § 4, which limits the debt of certain named political subdivisions, apply to or limit the Subdistrict? Clearly § 2 does not, as the references therein are to the state acting in that capacity and not by an agency or body politic which, so far as the Subdistrict is concerned, includes only a small part of the area of the state.

In the Wilson v. Board of Trustees' statement of the case reported in 133 Ill. 443, 27 N.E. 203, it appeared the trustees were about to sell bonds and had levied a tax to pay for them so the court proceeded to determine whether their constitution limited the sanitary district. A different situation exists in the case at bar which requires examination. The only obligation assumed to be incurred is that resulting from, and required to be paid by the Subdistrict in, the 34-page Master Contract, a copy of which appears in the record. The term is 40 years commencing when water becomes available. The United States proposes to construct Oahe Unit Works and the Subdistrict agrees to pay construction costs of the works and operation and maintenance thereof in 80 semi-annual payments. The formula for determining these payments and other terms of the contract are detailed and lengthy. Payments consist of a water service charge and a construction of distribution charge; the Subdistrict may execute participating contracts for delivery of water for domestic, livestock, irrigation, municipal and other uses. Revenues accruing therefrom are to be used to pay the annual installments due and, where an irrigation district is the water user, a security contract with the United States is required. A reference is made to the annual construction charge installment computed on different stated amounts for each acre of three classes of irrigable land. It thus appears that a substantial part of the installments to be paid by the Subdistrict is to come from the users of the water who derive a special benefit from the construction and operation of the works. Comment on such a charge appears in the Miles v. Benton Township opinion, supra.

However, paragraph 27 of the Master Contract requires the Subdistrict "cause to be levied and collected all necessary

assessments, tolls, and other charges, and will use all of the authority and resources of (the Subdistrict) to meet the obligations of (the Subdistrict) to make in full all payments to be made pursuant" to the contract. This clause is the same as the clause in the North Dakota Garrison opinion; other clauses, as well as the contents of the North Dakota statutes, are either identical or similar.

 Robbins v. Rapid City, 71 S.D. 171, 23 N.W.2d 144, involved a contract between the city and the United States wherein the latter agreed to construct a dam and storage reservoir to make a water supply available to the city. The city agreed to pay $500,000 in 40 annual installments of $12,500 each and the operation and maintenance charges of the joint works. The latter amount, as the payments here involved, was not and could not be "definitely ascertained and determined by the contract." The court wrote:

> "According to the weight of authority a continuing contract for the furnishing of electric, water or other service to a municipality, for which the municipality agrees to pay in annual installments as the service is furnished, does not give rise to a present indebtedness for the aggregate amount of the installments to become due. * * * No present debt is incurred to make Article XIII, Section 4, South Dakota Constitution, applicable."

Assuming some clause of Art. XIII, § 4 applies, which we do not determine, Robbins is decisive that payments to be made under the Master Contract do not incur a present debt as that term appears therein.[10]

---

10. Compare Barlow v. Clearfield City Corp., 1 Utah 2d 419, 268 P.2d 682, where a 60-year city water conservancy district with annual payments for water totaled $1,461,000 which exceeded constitutional limit, held where payment of annual installments could be made from water revenues collected by the city and the District could levy a general property tax on property within the city for any balance of the installment, it did not create a debt of the city as that term was used in the constitution.

We have concluded that rather than attempt to answer the questions in the forms certified, they may best be answered in the form of an opinion covering the problems presented.

To summarize, we conclude the legislature had power to enact Ch. 453, S.L.1959, now SDCL 46-17 and 46-18, creating the South Dakota Conservancy District and authorizing creation of a Subdistrict and the powers delegated to the respective Boards of Directors are valid; that the execution of a contract with the United States of America by the Subdistrict officers pursuant to the statutes in effect at the time was within that authority and consistent with the due process clause, Art. VI, § 2 of the South Dakota Constitution and the provisions for the levy, assessment and collection of taxes to make payment of any sums payable under the Master Contract are also valid delegations of power and do not offend any provisions of the Constitution of the State of South Dakota mentioned in the opinion. This conclusion is made on the statutes and record submitted and is not concerned with the facts involved or found by the court.

WOLLMAN, J., concurs.

RENTTO, P. J., concurs specially.

HANSON, J., dissents.

WINANS, J., having presided at the hearing in circuit court and deeming himself disqualified, did not participate.

RENTTO, Presiding Judge (concurring specially).

Ever since this matter was brought to our attention I have had genuine doubts concerning the jurisdiction of the circuit court to entertain the petition here involved. I am now persuaded that the legislature by enacting SDCL 46-18-39 provided a special in rem proceeding and upon notice given as required thereby, which was done here, the circuit court acquired jurisdiction of the subject matter. Nebraska Mid-State Reclamation District v. Hall County, 152 Neb. 410, 41 N.W.2d 397.

Our jurisdiction of the cause is not by reason of our superintending control but is rather an exercise of our constitutional appellate jurisdiction. With this limitation I concur fully in the opinion.